55 CCPA

**Edward FREDKIN, Appellant,**

v.

**Eugene H. IRASEK, Appellee.**

**Patent Appeal No. 7986.**

United States Court of Customs and Patent Appeals.

June 27, 1968.

Certiorari Denied Dec. 9, 1968.

See 89 S.Ct. 450.

Rines & Rines, Robert H. Rines, David Rines, Boston, Mass., Nelson H. Shapiro, Washington, D. C., for appellant.

Louis A. Kline, Dayton, Ohio, (John T. Matlago, Hawthorne, Cal., William T. Estabrook, Kemon, Palmer, Stewart & Estabrook, Washington, D. C., of counsel) for appellee.

Before WORLEY, Chief Judge, and RICH, SMITH, ALMOND and KIRKPATRICK,[*] Judges.

WORLEY, Chief Judge.

Fredkin appeals from the decision of the Board of Patent Interferences awarding Irasek priority of invention in an interference between Fredkin patent No. 3,105,593 [1] and an Irasek application.[2] Fredkin, as the junior party, has the burden of proving his case by a preponderance of the evidence.

The interference involves five counts corresponding to claims 1–5 of the Fredkin patent. The issues include whether the board erred in holding that the evidence Fredkin relies on to prove conception as to all the counts, and reduction to practice as to counts 1, 2 and 5, prior to the Irasek filing date was inadequate.[3] Also in dispute is whether the board erred in holding that Fredkin was precluded from questioning the support in the Irasek application for certain recitations in counts 3 and 4.

The invention relates to apparatus for removing a selected information storage card from a stack of such cards, automatically guiding the selected card past information sensing means, and thereafter returning it to the stack. Counts 1, 3 and 4 read:

1. Selector apparatus having in combination, a stack of cards containing information at a predetermined position thereon, said cards having at predetermined regions thereof card-coding elements, said elements defining different patterns for the respective cards, a plurality of card-holding members adjacent corresponding coding elements and having means for releasably coupling the holding members to coding elements of said cards, code-selective operating means for preventing the coupling of coding elements of a selected card with corresponding holding members, whereby the selected card may be separated from said stack, means for automatically guiding the selected card apart from said stack along a predetermined path and thereafter returning the selected card to said stack, and information-sensing means disposed along said path in alignment with said predetermined card position for scanning the information contained on the selected card as the selected card follows said predetermined path.

3. The apparatus of count 1, said information being arranged in a plurality of parallel tracks on said cards, said sensing means having plural scanning elements aligned with corresponding tracks as the selected card is moved along said path past said scanning elements.

4. The apparatus of count 1, said coupling means being magnetic.

Counts 2, and 5, like 3 and 4, are dependent on count 1. Count 2 describes the card-coding elements as "comprising" notches in the upper edge of the cards. Count 5 specifies that the infor-

* Senior District Judge, Eastern District of Pennsylvania, sitting by designation.

1. Issued October 1, 1963 on an application filed September 19, 1960.

2. Serial No. 12,032, filed March 1, 1960.

3. Since those holdings were determinative of the priority question, the board did not consider Irasek's evidence of conception and reduction to practice prior to his filing date.

mation is stored magnetically, and that the sensing means is a magnetically sensitive pick-up.

For a fuller understanding of the invention, reference is made to Fig. 2 of the Fredkin patent:

*Fig. 2*

Fig. 2 shows the invention applied to four cards, designated I-I, I-II, II-II and II-I, by way of illustration, although a larger number of cards is contemplated. The upper edge of each card has four slots, each of which is either straight sided as at A or has notched sides providing a narrowed opening as at B. The cards are normally supported in stacked vertical position on horizontal holding members which are disposed in the slots. The holders are inverted V-shaped longitudinal members hinged along their centers so that normally only the straight-sided slots in the cards are free from movement relative thereto, while the notches in the other slots restrain the cards from dropping out of the stack. Operating buttons 1″, 2″, 1‴ and 2‴ selectively operate pinchers 20 which compress the holders about their hinges to reduce the width of selected holders

to permit slots with notched sides to move downwardly therefrom. The notches are arranged in a different combination on each card in accordance with a binary code or the like. Thus, actuation of different combinations of buttons permits different cards to drop from the holders. In Fig. 2, card I-I has been selected and is shown being moved horizontally to the right on a belt 5 past a plurality of vertically-spaced magnetic detectors 29′ which serve to detect information on a plurality of correspondingly disposed recording strips on the card. Belt 5 continues to move the card until it reaches dotted line position I′-I′. From there the card is moved by belts 7 having lugs 7′ to a vertical position as shown at I″-I″. A belt 9 then carries the card to the left where it rest against a support 11′. The left edge of the card is pressed against a bar

21 to close electrical contacts 19 and thereby energize a solenoid 13 momentarily. The solenoid then acts through the armature 15 to move the surface 11′ forward to a solid line position 11 to pass the slots over the free ends of the corresponding holders to restore the card to the stack.

In an alternate arrangement, Fredkin omits the coded slots earlier described. Instead, he provides a coded arrangement of what he describes as permanent magnets at the top of each card. Electrically magnetizable bars, which are provided to cooperate with the magnets to hold the cards, may be selectively de-energized for the purpose of releasing cards selected according to the code.

In his brief, Fredkin states that the issues as to counts 3 and 4, which relate to support in the Irasek application, "are the most clear cut" and discusses them first. We will do the same.

It appears that, during the motion period, Fredkin moved to dissolve the interference as to count 3 on the ground that:

> Count 3 specifies "a plurality of parallel tracks on said cards" and "plural scanning elements aligned with corresponding tracks", which structure has not been disclosed, described, illustrated, or claimed in the original Irasek application, Serial No. 12,032, in interference; wherefore the party Irasek has no right to make the said Count 3, the said Count is unpatentable to Irasek, and there is, accordingly, no interference in fact with regard thereto, so that the interference should be dissolved as to Count 3.

The examiner denied that motion, finding that the Irasek application discloses a plurality of write (recording) heads and a plurality of read (reproducing) heads, with the path of movement of his cards as the cards pass the heads being such as to clearly teach the use of parallel recording paths or tracks.

Before the board Fredkin asserted that count 3 should be interpreted as requiring *simultaneous* extraction of information from the plural tracks, and that Irasek does not disclose that feature. The board agreed with the examiner as to the matter raised in the motion to dissolve. However, it declined to consider whether the count requires simultaneous extraction of information from the plural tracks, stating:

> * * * Since these arguments were not raised by motion [to dissolve] under Rule 232(a), they are not proper for our consideration now. Franklin v. Hopper, 312 F.2d 949, 50 CCPA 931 * * *.

The cited case of Franklin v. Hopper involved an interpretation of Rule 258 [4] of the Rules of Practice of the Patent Office. There a party was held not entitled to question before the board certain aspects of his opponent's support for a count where he had neither raised the question by motion nor shown good reason for his failure to do so.

Before us, Fredkin again argues that count 3 requires simultaneous extraction of stored information from a plurality of tracks, and that the Irasek application does not disclose that feature. He also argues that Irasek himself conceded in his testimony that there is no such disclosure in his application. Fredkin avoids the question of whether he raised the matter of simultaneous scanning in his motion, electing to assert that he

---

4. 258. Matters considered in determining priority. (a) In determining priority of invention, the Board of Patent Interferences will consider only priority of invention on the evidence submitted. Questions of patentability of a claim generally will not be considered in the decision on priority; and neither will the patentability of a claim to an opponent be considered, unless the nonpatentability of the claim to the opponent * * * relates to matters which have been determined to be ancillary to priority and must be considered, *but a party shall not be entitled to raise such nonpatentability unless he has duly presented and prosecuted a motion under rule 232 for dissolution upon such ground or shows good reason why such a motion was not presented and prosecuted.* [Emphasis ours.]

"*did* raise the very issue that this requirement in count 3 of the '*plural scanning* elements * * * has not been disclosed.'"

Irasek argues that his application "contemplates not only 'plural scanning' of a plurality of channels, but also selective plural or singular scanning by any one head, all of the heads or any combination of the heads." He also questions whether the terminology of count 3 requires "simultaneous plural scanning."

Quite apart from those contentions, whether Irasek discloses plural scanning elements is a different question from whether he discloses, or count 3 requires, that plural scanning elements be read *simultaneously*, as the board recognized.

For the reasons given by the board, we are satisfied that it did not err in its treatment of Fredkin's contentions that Irasek lacks support for count 3. Strashun v. Dorsey, 345 F.2d 201, 52 CCPA 1726 (1965); Franklin v. Hopper, supra; Anderson v. Walch, 152 F.2d 975, 33 CCPA 774 (1956). Moreover, the charge that Irasek conceded that his application does not disclose simultaneous plural scanning is based on certain questions answered by Irasek on cross-examination, and careful scrutiny of the questions and answers relied on reveals no such concession. Although Irasek and another of his witnesses did state that certain test operations did not include simultaneous reading of plural tracks, such statements obviously are not concessions as to the content of the application disclosure.

Fredkin also argues that Irasek has no support in his application for the limitation of "said coupling means being magnetic" in count 4. The board, pointing out that no motion to dissolve as to count 4 was made during the motion period, ruled that the question was not before it and declined to rule thereon.

Fredkin admits that he did not include count 4 in his motion to dissolve, referring to "a misunderstanding of the Irasek disclosure." However, he urges that "Irasek himself admitted during his testimony that there simply is no disclosure in the Irasek application * * * of a magnetic coupling between a card holding member and coding elements adjacent thereto." It is Fredkin's contention that it was the duty of the board, *sua sponte*, to rule on the matter because of the alleged admission, citing Smith v. Foley v. Anderson v. Smith, 1908 C.D. 210, 136 O.G. 847 (Comr.Pat.1907); White v. Wege, 44 App.D.C. 495, 1916 C.D. 195, 227 O.G. 1107 (1916); and Heuberger v. Becker, 107 F.2d 601, 27 CCPA 746 (1939).

We think it plain that the action of the board with respect to claim 4 should not be disturbed because the issue was not raised by appropriate motion. While the cited cases indicate that the board may act *sua sponte* in certain circumstances, they also indicate that there are limitations on such action. Thus, the board is free to decline to consider a question of support which is not raised by a party even in a case where it would be appropriate for it to raise the question. As this court stated in Heuberger v. Becker, supra:

It is clear that if the Examiner of Interferences [now Board of Patent Interferences] had not raised the question he could properly have ruled that this question would not be considered by him because of failure of appellee to raise it during the motion period.

Also, the board could hardly have raised the present question *sua sponte* since it was in fact raised by Fredkin. See Franklin v. Hopper, supra.

It is also apparent that Irasek has not admitted that his application does not support count 4. The language in Irasek's testimony relied on by Fredkin as admissions involve decidedly different terminology than is present in count 4. Specifically, Irasek answered negatively as to whether he disclosed "magnetic, as distinguished from electro-magnetic,

coupling means *as the force between the rods supporting the cards and the notches of the cards"* [Emphasis supplied]. Irasek does disclose the use of an electromagnet to turn cardholding rods to positions releasing the cards and contends that the claim language is broad enough to cover that construction. While Fredkin expresses the fear that Irasek will obtain a patent with an invalid claim, that question is not a matter which can be considered here. Kleinman v. Steinbach, 187 F.2d 743, 38 CCPA 924 (1951).

Turning to the question of priority, Fredkin contends that he reduced to practice the invention of counts 1, 2 and 5 prior to the Irasek filing date and that he conceived the invention of counts 1–5 prior to that date and proceeded diligently up to his own filing date. Concerning the asserted conception, the board stated:

> * * * the Fredkin testimony establishes, at best, only the conception of the card dropping mechanism, and not of either the code-selective operating means or the automatic guiding means, particularly not the means for returning the card to the card supporting and dropping means. The conception of the specific construction of the latter two elements did not occur until after the Irasek filing date.

The evidence apparently relied on by Fredkin before us is a written disclosure made in December 1959 and a demonstration made in the presence of his attorney at about the same time. That demonstration is the act relied on for reduction to practice.

The aforementioned disclosure, apparently dictated in Fredkin's presence by his attorney, is dated December 29, 1959. It refers to a card selector system "in which notches are cut in the upper surface of the cards in a predetermined coded fashion." It also makes reference

to hinged members passing through the notches to support the cards in such manner that selective collapsing of those members permits the selected card to fall from the stack. The cards are described as provided with magnetic tape whereby the card dropped from the stack may be moved laterally across a magnetic reproducing head to "play the information on the tape." The disclosure states:

> The cards may then be returned by any well known mechanical gadget to place them on the hinges again in any desired order.

The demonstration involved crude apparatus representing the cards and card-holding members. The cards were five cardboard strips with coded notches cut therein. One card, a duplicate of one of the other four as to coding, had a horizontal strip of recording tape pasted thereon. The holding members were four narrow cardboard strips folded longitudinally along their centers to assume an inverted V-shape. The ends of the strips rested on spaced box members with the cards suspended from the intermediate portion of the strips. Two other spaced boxes were disposed against the opposite edges of the stacked cards to serve as guide means.

Fredkin testified that, in the demonstration, he pinched the paper cardboard strips to cause the card having the strip of magnetic tape thereon to drop from the cardboard strips, moved the card by hand past a magnetic pick-up head connected to a meter or loud speaker and then "brought the card back over to the stack and put it back into the stack."

We think it is readily apparent that the demonstration did not constitute a reduction to practice of counts 1, 2 and 5.[5] The device reduced to practice must include every limitation of the counts, Kirkham v. Arden, 316 F.2d 242, 50 CCPA 1205 (1963), and the appara-

---

5. There is no contention that the demonstration constituted a reduction to practice of counts 3 and 4, it being apparent that the apparatus did not include a plurality of tracks or scanning elements (count 3) or include any magnetic means (count 4).

tus demonstrated here obviously did not include "means for automatically guiding the selected card apart from said stack along a predetermined path and thereafter returning the selected card to said stack." Fredkin's manual operations in guiding the card and then returning it to the stack do not comply with the requirement for means for automatically performing the recited functions. See Wilcox v. Danner, 53 F.2d 711, 19 CCPA 802 (1932). At oral argument, Fredkin argued that the word "automatically" in the quoted term does not apply to the means for "returning" the card. We think that contention plainly is without merit since "for automatically" in count 1 obviously applies to both "guiding" and "returning." Even were that not the case, the demonstration apparatus lacked "means" for "automatically" guiding.

The matter of whether Fredkin's evidence proves conception involves a different question. Fredkin argued before the board that conception may be regarded as complete if the inventor makes a disclosure which would enable a person of ordinary skill in the art to construct the apparatus without extensive research or experimentation, citing In re Tansel, 253 F.2d 241, 45 CCPA 834 (1958). The board also acknowledged "testimony of Fredkin and Allen purporting to establish that card transport mechanisms were well-known at the time of Fredkin's alleged conception." It nevertheless concluded:

> * * * The record, however, fails to show a suitable card return means was then well-known, and establishes only Fredkin's expectation that some available device would work satisfactorily * * *. It is our opinion that considerable experimenting would still be required in order to provide the dropping and transport mechanisms

with a compatible return means, particularly since the card dropping mechanism was structurally unique and had not yet been completely designed. Conception requires more than the belief or expectation that the completed apparatus will successfully operate and must include means for producing the desired result. Burson v. Vogel, 29 App.D.C. 388, 1907, C.D. 669.

We are satisfied that the board did not err in its conclusion. As stated in Mergenthaler v. Scudder, 11 App.D.C. 264, 81 O.G. 1417, 1897 C.D. 724: [6]

> * * * The conception of the invention consists in the complete performance of the mental part of the inventive act. All that remains to be accomplished in order to perfect the act or instrument belongs to the department of construction, not invention. It is, therefore, the formation in the mind of the inventor of a definite and permanent idea of the complete and operative invention as it is thereafter to be applied in practice that constitutes an available conception within the meaning of the patent law.

The reference in the written disclosure to the use of "any well known mechanical gadget" leaves the structure to be used for automatically guiding and returning the cards entirely undisclosed. Likewise, the demonstration wherein the card was returned to the stack by hand identifies no particular structure for performing that operation.

Fredkin argues that equipment for the "means for automatically * * * returning the selected card" to the stack was well-known, citing his testimony that:

> I satisfied myself that that was a feasible way to do this, and my general experience as an engineer in the com-

---

**6.** Other representative cases on the question of sufficiency of evidence of conception which we have considered here include Land v. Dreyer, 155 F.2d 383, 33 CCPA 1108 (1946); Bac v. Loomis, 252 F.2d 571, 45 CCPA 807 (1958), and Summers v. Vogel, 332 F.2d 810, 52 CCPA 716 (1964). It is unnecessary to discuss those cases in any detail since the present dispute is not concerned with what the law is but with how it applies to the particular facts.

puter field was such that I felt I had familiarity with enough card holding machinery that moved cards around and put them in stacks, that I felt this was well-known enough in the art that I did not have to concern myself with demonstrating it.

He also states that witnesses, Dr. Allen, Dr. Swets and Mr. Ball, testified that the card-returning function "was in Fredkin's contemplation and oral description at that time."

However, we do not find that the evidence relied on establishes that a person of ordinary skill in the art could complete the invention as then disclosed without extensive research and experimentation. The record shows that the board was correct in observing that Fredkin's card dropping mechanism was unique and not yet fully designed. The description of the prior art in the December 1959 disclosure reads:

> Whereas previous card sorting devices have been employed such as those involving the use of rods passed through openings at the bottom of cards whereby operation of the rod separates all of the undesired cards from the desired cards leaving the same attached to the rod system; or correlative rods are withdrawn from the top or other positions of cards leaving behind only the desired card with the other cards falling away, there are inherent disadvantages in such a system. One such disadvantage lies in the fact that it is the correlative cards that are in effect moved and not the desired card which is separated from the holding mechanism and is thus available for the free operation of [sic] apart from that mechanism. Other proposals that have overcome this difficulty, however, have required the insertion and withdrawal of rods from an array of cards in order to have a free falling or otherwise freely accessible preselected card removed from the filing mechanism.

The disclosure itself thus indicates that prior art systems involved removing undesired rather than desired cards from the stack or insertion and withdrawal of rods, which arrangements would appear to be of little assistance in providing an automatic card return mechanism for Fredkin's system for dropping the cards. Also, the card-holding members were supported at both ends as late as the December 1959 demonstration whereas the embodiment shown later in the application has the holders mounted with one end free so that each returning card can be slid on to the holders from the end.

The record includes no evidence of any particular previously known card return system that might be adapted for use by Fredkin. Moreover, Fredkin's above-quoted statement that he felt card moving machinery was well-known enough in the art that he did not have to concern himself with demonstrating it is of little probative value as evidence that it was within the ability of one skilled in the art to complete his invention. The cited testimony of Allen, Swets and Ball actually adds nothing of significance to the December 1959 disclosure as discussed previously. None of those witnesses testified that structure to enable a person of ordinary skill in the art to complete the invention was available at the time in question.

Finally, Fredkin states that his attorney was able to evolve the specific mechanism shown in the application without further help from Fredkin and argues that it is thereby shown that mechanism of the required type was well known. Whatever validity that argument might otherwise have had, it must fail for lack of support in the record. Thus Fig. 2 is the only figure of the application showing the card-return or transport system and the attorney himself testified that the system "was changed to the form of Fig. 2 after consultation with Mr. Fredkin."

The decision is affirmed.

Affirmed.