Erich F. MEITZNER and James A. Oline, Appellants,

v.

Herbert CORTE et al., Appellees.

Patent Appeal No. 76–554.

United States Court of Customs and Patent Appeals.

July 15, 1976.

Eugene Sabol, Fisher, Christen & Sabol, Washington, D. C., attys. of record, for appellants; George W. F. Simmons, Robert A. Doherty, Philadelphia, Pa., of counsel.

Nicholas E. Oglesby, Jr., Connolly & Hutz, Wilmington, Del., attys. of record, for appellees.

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE and MILLER, Associate Judges.

BALDWIN, Judge.

This appeal is from a decision of the Patent and Trademark Office Board of Patent Interferences [1] (board) awarding priority to the senior party Corte et al. [2] over the junior party Meitzner et al. [3] on all twelve counts in interference. We affirm in part and reverse in part.

### The Counts

Counts 6 through 9 and 12 are directed generally to cation exchange resin compositions and counts 1 through 5, 10, and 11 are directed to processes for preparing such resins. The resins comprise a water-insoluble matrix having bonded thereto cation exchange groups including, for instance, sulfonic acid or carboxylic acid groups. The matrix is prepared by copolymerizing a monoethylenically unsaturated monomer, such as styrene, and a polyethylenically unsaturated monomer, such as divinyl benzene. Polymerization is carried out in an organic liquid which is a solvent for the monomers but a non-solvent for linear aromatic vinyl polymers. The matrix is described in all counts as having a "spongy" structure which is permeated by small veins into which liquids may penetrate.

Counts 1 and 6 are typical of the process and product counts, respectively, and are reproduced below:

1. Interference No. 98,110.

2. Involved on U. S. Patent No. 3,586,646, entitled "Cation Exchanger with Sponge Structure," and issued on June 22, 1971, from application serial No. 727,045, filed April 8, 1958. Corte et al. have further been accorded the

1. In a process for preparing a cation exchange resin having a water-insoluble matrix and cation exchange groups bonded thereto which are selected from the group consisting of sulfonic acid, carboxylic acid, phosphoric acid, and phosphonic acid groups, the improvement comprising employing as said matrix a solid copolymer of spongy structure which is permeated by small veins into which liquids are able to penetrate, which matrix is prepared by copolymerizing a mixture consisting essentially of (1) a monoethylenically unsaturated monomer selected from the group consisting of a monovinyl carbocyclic aromatic compound, a monoethylenically unsaturated carboxylic acid, a monoester of a lower aliphatic alcohol and a monoethylenically unsaturated polycarboxylic acid, a completely esterified monoethylenically unsaturated polycarboxylic acid, and an anhydride of a monoethylenically unsaturated polycarboxylic acid, with (2) a polyethylenically unsaturated monomer selected from the group consisting of a polyvinyl carbocyclic aromatic compound, an ester of a dihydric alcohol and an $\alpha - \beta$ -ethylenically unsaturated carboxylic acid, diallyl maleate, divinyl ether, and divinyl ketone; the aforesaid copolymerization being conducted while the monomers are dissolved in 10 to 300% by weight, based on monomer weight, of an organic liquid which is a solvent for said monomers but is unable to dissolve linear aromatic vinyl polymers.

6. A cation exchange resin consisting of a water insoluble matrix and cation exchange groups bonded thereto which are selected from the group consisting of sulfonic acid, carboxylic acid, phosphoric acid, and phosphonic acid groups, wherein as said matrix there is employed a solid opaque copolymer of spongy structure

benefit of the filing date of German application serial No. F22,878 IVb/39c, filed April 20, 1957, pursuant to the provisions of 35 USC 119.

3. Involved on application serial No. 749,526, filed July 18, 1958, and entitled "Polymerization Processes and Products Therefrom."

which is permeated by small veins into which liquids are able to penetrate, which matrix is prepared by copolymerizing a mixture consisting essentially of (1) a monoethylenically unsaturated monomer selected from the group consisting of a monovinyl carbocyclic aromatic compound, a monoethylenically unsaturated carboxylic acid, a monoester of a lower aliphatic alcohol and a monoethylenically unsaturated polycarboxylic acid, a completely esterified monoethylenically unsaturated polycarboxylic acid, and an anhydride of a monoethylenically unsaturated polycarboxylic acid, with (2) a polyethylenically unsaturated monomer selected from the group consisting of a polyvinyl carbocyclic aromatic compound, an ester of a dihydric alcohol and an $\alpha - \beta$ -ethylenically unsaturated carboxylic acid, diallyl maleate, divinyl ether, and divinyl ketone, the aforesaid copolymerization being conducted while the monomers are dissolved in 10 to 300% by weight, based on monomer weight, of an organic liquid which is a solvent for said monomers but is unable to dissolve linear carbocyclic aromatic vinyl polymers.

### Findings of Fact by the Board

The board made certain undisputed findings of fact which are relevant to Meitzner et al.'s case for an actual reduction to practice and which are summarized below.

The cation exchange resins involved in this interference possess a spongy or macroreticular structure as opposed to a gel-type structure. A macroreticular structure may be compared with a ball of tough, rigid sponge having large discrete pores. Macroreticular resins offer advantages over gel-type resins, which are not spongy and which do not have any true porosity, since (1) high molecular weight ions may be more completely removed, and (2) the open structure of the macroreticular resins permits the use of tough copolymers which would be too dense to effectively act as ion exchange resins if they were used in a gel-type system.

During March of 1957, while working as an employee of the Rohm and Haas Company (hereinafter R & H), under the direction of Oline, Sigafoos prepared raw beads by copolymerizing styrene and divinyl benzene in 35% tertiary amyl alcohol using standard aqueous suspension polymerization techniques. These raw beads were milky white and floated on the surface of the suspension polymerization medium. They had an ethylene dichloride (EDC) swelling ratio of 1.5. The EDC swelling ratio is an indication of the increase in volume of an EDC filled raw bead following immersion of the raw bead in EDC. It is determined by dividing the volume of an EDC filled raw bead by the volume of a dry raw bead.

On March 18, 1957, Sigafoos sulfonated the raw beads. The sulfonation process proceeded rapidly as evidenced by the high volume capacity of the sulfonated raw beads obtained within 2½ hours. On March 25, 1957, Sigafoos determined that the sulfonated raw beads could be used to neutralize sodium hydroxide.

On April 4, 1957, the sulfonated raw beads produced by Sigafoos were submitted to the appropriate R & H laboratory for a "standard" evaluation. Oline requested the evaluation and Meitzner approved the request, which states, *inter alia* :

We are submitting for your evaluation a sample of IR–120 type resin prepared by extending a styrene-20% DVB [divinyl benzene] formulation with 35% t-amyl alcohol. Although the raw beads were sulfonated with tech [technical] $H_2SO_4$ [sulfuric acid], their bead integrity is exceptionally good (even though the beads are on the small side). The solids content of the sulfonated resin in the H + form is 48.2% which indicates a porosity similar to that for IR–120. Stability tests may be interesting.

The IR–120 referred to in Oline's request was a commercial ion exchange resin marketed during March and April of 1957 under the registered trademark Amberlite IR–120. It is a gel-type ion exchange resin having a matrix comprising a copolymer of styrene and divinyl benzene.

Dr. Robert Kunin, employed by R & H as head of the Ion Exchange Evaluation Laboratory, testified, as summarized by the board, that he was aware of the work being done by Sigafoos during February through April of 1957, and that he was also aware of the following:

(a) The milky white character of the raw beads obtained by Sigafoos suggested that the beads had a spongy structure which was permeated by small veins * * *.

(b) The raw beads produced by Sigafoos were relatively highly cross-linked * * *.

(c) The EDC swelling ratio of 1.5 of the raw beads "was exceedingly high for copolymer beads as highly cross-linked as these were and could only be explained in terms of veins or pores permeating the beads and into which the liquid, EDC, was able to penetrate" * * *.

(d) The volume capacity test used by Sigafoos "was devised by me and simulates actual field conditions in those cases where it is desired to neutralize sodium hydroxide" * * *.

(e) The cation exchange resin made by Sigafoos "functioned as a cation exchange resin and had commercial utility as a cation exchange resin" * * *.

(f) The solids content of the sulfonated raw beads produced by Sigafoos confirmed high porosity and was consistent with the characteristics of a spongy bead structure which was permeated with small veins into which liquid could penetrate * * *.

An analysis was conducted in March of 1965 at R & H of the cation exchange resin beads made by Sigafoos in March of 1957. This analysis confirmed that the beads, in fact, possessed pores or a spongy structure which was permeated by small veins into which liquids may penetrate.

### The Opinion of the Board

The board determined that Meitzner et al. did not prove an actual reduction to practice by a preponderance of the evidence. Meitzner et al., in the board's view, failed to prove that they recognized the new form of raw bead required by both composition and process counts prior to April 20, 1957, the earliest date of Corte et al. The board noted:

In our opinion, Meitzner et al. have failed to prove that they recognized the new form of raw bead prior to April 20, 1957. Sigafoos did not indicate in his laboratory notebook (Ex. 1) that the raw beads made by him were spongy. The only contemporaneous document (Ex. 3), which was written by named joint inventor Oline and approved by named joint inventor Meitzner, characterizes the sulfonated raw beads made by Sigafoos as having a "porosity similar to that for IR–120" (Finding 8). IR–120 was a gel-type ion exchange resin and hence was not made from a raw bead which was spongy (Finding 9). The designation of the sulfonated raw beads as being porous does not indicate that Meitzner et al. appreciated the fact that the raw beads were spongy.

With regard to Kunin's testimony that he knew in 1957 that sulfonated raw beads prepared by Sigafoos were spongy, the board observed:

The difficulty with Kunin's unchallenged testimony is that it is not entirely consistent with the contemporaneous characterization of the raw beads by named joint inventor Oline. Oline compared the sulfonated raw beads prepared by Sigafoos to gel-type ion exchange resins. Gel-type ion exchange resins are not spongy. Moreover, insofar as we can determine from the record before us, no individual at Rohm and Haas Company had determined, prior to April 20, 1957, how to analyze a raw bead to determine if it was spongy.

Kunin further testified that prior to April 20, 1957, he understood Oline's notation on the request for a "standard" evaluation to indicate that the sulfonated raw beads made by Sigafoos were spongy:

I [meaning Kunin] understood the statement . . . [on the request] to mean porosity in the gross, quantitative sense

as measured by water absorption; not in the specific qualitative sense as determined by the presence or absence of macropores or small veins permeating the bead structure into which liquids are able to penetrate. [Bracketed material in original.]

The board commented with regard to this testimony:

The noted-testimony does not refer to any spongy structure. Moreover, inasmuch as Oline was available to testify, we do not believe Kunin is the proper witness to explain what Oline may have meant by the notation on the request.

Rejecting Meitzner et al.'s case for priority on counts 10 through 12, which specifically require that the cation exchange groups be "carboxyl groups," the board found that Meitzner et al. failed to establish that "the steps of process counts 10 and 11 were performed or that the composition of product count 12 was composed." The board commented:

Assuming *arguendo* that the work by Meitzner et al. with a sulfonated raw bead made from styrene and divinyl benzene was sufficient to establish an actual reduction to practice by Meitzner et al. of the subject matter of counts 1 through 9, that work would not establish an actual reduction to practice of the subject matter of counts 10 through 12. Every limitation in a count is material and must be proved to establish an actual reduction to practice. *Fredkin v. Irasek*, 397 F.2d 342, 55 CCPA 1302, 158 USPQ 280 (1968), *cer't* [sic] *denied*, 393 U.S. 980, 89 S.Ct. 450, 21 L.Ed.2d 441, 159 USPQ 799 (1968); *Tennessee Valley Authority v. Monsanto Chemical Co.*, 383 F.2d 973, 154 USPQ 509 (5th Cir. 1967). * * * Moreover, insofar as Meitzner et al. argue the subject matter of counts 10 through 12 is equivalent to the subject matter of counts 1 through 9, we note that the doctrine of equivalents does not apply in interference proceedings. *Smith v. Stone*, 420 F.2d 1065, 57 CCPA 884, 164 USPQ 453 (1970).

The board also noted that Meitzner et al. had established a practical utility for the subject matter of the counts because it had been determined by Meitzner et al. that the sulfonated raw beads "could be used to neutralize sodium hydroxide."

## OPINION

### *Counts 1 through 9*

█ The solid copolymer matrix (or raw beads) recited in the counts is a new form of an otherwise old composition. The new form is characterized in the counts as a "spongy" structure, which is permeated by small veins into which liquids may penetrate. For the purpose of establishing priority in an interference proceeding, there can be no conception or reduction to practice either of the new form or of a process using such a new form of an otherwise old composition where there has been no recognition or appreciation of the existence of the new form. *Silvestri v. Grant*, 496 F.2d 593, 181 USPQ 706 (CCPA 1974), *cert. denied*, 420 U.S. 928, 95 S.Ct. 1126, 184 USPQ 641 (1975); *Langer v. Kaufman*, 59 CCPA 1261, 465 F.2d 915, 175 USPQ 172 (1972); *Heard v. Burton*, 333 F.2d 239, 51 CCPA 1502, 142 USPQ 97 (1964).

The analysis conducted by R & H in 1965 of the cation exchange resin beads made by Sigafoos in March of 1957 establishes that Meitzner et al. in fact satisfied all the limitations and features of counts 1 through 9. The utility proofs submitted by Meitzner et al. also have been found sufficient to establish a practical utility for the subject matter of the counts. Accordingly, the only issue in this appeal relative to our disposition of counts 1 through 9 is whether Meitzner et al. recognized the new form of raw beads prior to April 20, 1957, the date of Corte et al.'s constructive reduction to practice.

The "spongy" structure limitation of the counts is characterized by Meitzner et al. as an inferred limitation because neither the Corte et al. patent in which the limitation originated nor the corresponding priority application teaches "any method or technique for observing, determining or measuring the structure." Meitzner et al. assert that the spongy structure is inferred from three outward manifestations speci-

fied by Corte et al. either in their German priority application or in their involved patent. The three outward manifestations from which the spongy structure is asserted to be inferred are: (1) "a milky, opaque to non-transparently white appearance," (2) resistance of the polymer particles to destruction upon subsequent chemical reaction, including saponification or sulfonation, and (3) the high chemical reactivity of the new form of resins relative to corresponding resins having a gel-type structure which are produced without addition of the organic liquid.

Meitzner et al. further assert that the three outward manifestations of the spongy structure limitation of the counts were observed and documented on their behalf prior to April 20, 1957.

Looking to Meitzner et al.'s evidence, it is revealed that raw beads were prepared during March of 1957 by Sigafoos under the direction of Oline. The beads were made by copolymerizing styrene and divinyl benzene dissolved in 35% tertiary amyl alcohol using standard aqueous suspension polymerization techniques. Sigafoos testified that the raw copolymer beads obtained were "milky, white beads which floated on the surface of the suspension medium rather than settling out in the usual manner." Sigafoos also testified that "[t]he milkiness we normally don't get in our standard ion exchange resins" and that "the system was different from our standard systems in that this was a little unusual, this milkiness in polymerization." Dr. Meitzner testified under cross-examination that he was "struck with the unusual appearance of the material."

The contemporaneous recognition of this characteristic or manifestation of the raw beads by Meitzner or by Sigafoos on Oline's behalf is confirmed by the Sigafoos laboratory notebook (Meitzner Exhibit 1, page 2), the authenticity of which has not been challenged by Corte et al.

Concerning Meitzner's recognition of the second and third recited manifestations, the evidence reveals that in March of 1957 Sigafoos subjected the raw beads to sulfonation with sulfuric acid using standard sulfonating techniques. He testified that the sulfonation proceeded quite rapidly, as evidenced by the high volume capacity of the sulfonated beads obtained after only 2½ hours of sulfonation. The Sigafoos notebook (Meitzner Exhibit 1, page 4) confirms that the volume capacity of the sulfonated beads was observed to be 2.05 meq./ml. after 2½ hours of sulfonation. Meitzner's Monthly Summary for March of 1957 (Meitzner Exhibit 2, page 2) confirms that the relatively high chemical reactivity of the new form of resin was appreciated by Meitzner et al. prior to April 20, 1957. The Monthly Summary states that "[s]ulfonation of the resultant beads proceeded at a rapid rate."

The sulfonation of the raw beads conducted in March of 1957 by Sigafoos also served to establish the resistance of the polymer particles to destruction upon sulfonation. Sigafoos observed in his notebook that the sulfonated product was in 100% bead form of which 95 to 100% were perfect. Meitzner's Monthly Summary for March of 1957 documents his appreciation of this observation by noting the "excellent preservation of bead integrity" upon sulfonation. Mr. Oline further documented this finding in the Evaluation Request (Meitzner Exhibit 3, page 2) submitted by him on April 4, 1957, in which he noted that "their bead integrity is exceptionally good."

■ We think the above evidence clearly establishes that Meitzner and Oline recognized and appreciated, prior to April 20, 1957, the outward manifestations or characteristics of the resin which the Corte et al. patent, the source of the counts, referred to as a "spongy" structure. Expressed otherwise, the evidence establishes that Meitzner and Oline were alert to the fact that they discovered an improved resin and that they or others working in their behalf recognized and appreciated that a new or different form of resin had been discovered.[4] In

---

4. We take no issue with the board's dismissal of Kunin's testimony that the R & H people were aware that the raw beads prepared by Sigafoos were spongy.

view of the above-noted evidence, we do not find it controlling that they failed to document, *in haec verba*, the spongy structure limitation of the counts. As we stated in *Heard v. Burton*, supra, 333 F.2d at 243, 51 CCPA at 1507, 142 USPQ at 100:

> We agree with appellant that it is irrelevant that Heard never referred to or appreciated the support material to be *eta*-alumina or to contain *eta*-alumina *by that name*. Nor do we interpret the board's opinion as so requiring. However, we consider it fatal to appellant's case that not until after appellees' filing date did Heard recognize that his "ammonia-aged" catalyst, as appellees put it, "*contained any different form of alumina at all!*" [Emphasis in original.]

Furthermore, as we stated in *Silvestri v. Grant*, supra, 181 USPQ at 710: "The invention is not the *language* of the count but the subject matter thereby defined." (Emphasis in original.) We conclude that Meitzner et al. have satisfied their burden of proving priority with respect to the subject matter defined by counts 1 through 9 by a preponderance of the evidence.

In support of its conclusion that Meitzner et al. failed to prove a prior reduction to practice, the board observed that a contemporaneous Oline evaluation request (Meitzner Exhibit 3) characterized the raw beads made by Sigafoos as having a "porosity similar to that for IR–120," a gel-type resin. The testimony of Dr. Kunin, a person skilled in the art of ion exchange resins, is useful in this regard. He stated that IR–120 was made with 8 to 9% divinyl benzene but that the raw beads made by Sigafoos had 20% divinyl benzene, more than twice as much divinyl benzene as IR–120. The higher divinyl benzene content, according to Kunin, was expected to result in increased cross-linking and more dense beads which *ordinarily* allow water to enter only with difficulty. In view of Kunin's explanation, Oline's observation that the porosity of the raw beads prepared by Sigafoos was "similar to that for IR–120" (despite the higher divinyl benzene content and resultant cross-

linking) is entirely consistent with a finding that Meitzner et al. recognized a new form of resin.

*Counts 10 through 12*

■ Counts 10 through 12 specifically require, *inter alia*, that the cation exchange groups be "carboxyl groups." Meitzner et al. admit that they did not actually make the invention defined by those counts prior to April 20, 1957. Nevertheless, they argued before the board, as they do here, that their work with a sulfonated raw bead made from styrene and divinyl benzene should suffice as a reduction to practice of the subject matter of counts 10 through 12 because that subject matter is an "obvious extension" of the other counts.

■ We agree with the board that Meitzner et al. have failed to establish priority of the subject matter of counts 10 through 12. All limitations appearing in interference counts will be regarded as material to the invention covered by the counts. *Wetmore v. Quick*, 536 F.2d 937 (CCPA, decided June 24, 1976); *Fredkin v. Irasek*, 397 F.2d 342, 55 CCPA 1302, 158 USPQ 280, *cert. denied*, 393 U.S. 980, 89 S.Ct. 450, 21 L.Ed.2d 441, 159 USPQ 799 (1968); *Kirkham v. Arden*, 316 F.2d 242, 50 CCPA 1205, 137 USPQ 370 (1963). This general principle applies with equal force and has the same effect in priority contests involving chemical as well as non-chemical inventions. *Wetmore v. Quick*, supra.

■■ An actual reduction to practice requires a showing of an embodiment of the invention in a physical or tangible form which shows every element of the invention defined in the count. *Wetmore v. Quick*, supra. The prior appreciation of the alleged "critical feature" of the invention, which critical feature is asserted by Meitzner et al. to reside in the general type and amount of inert solvent used in the production of the raw beads, is insufficient to establish an actual reduction to practice of the subject matter defined by counts 10 through 12. *Wetmore v. Quick*, supra.

For the foregoing reasons, the decision of the board is *affirmed* as to counts 10 through 12 and *reversed* as to counts 1 through 9.

*MODIFIED.*