In re Bruce Charles FARRENKOPF and
Magdalena Usategui-Gomez, and Tra-
venol Laboratories, Inc., Intervenor.

Appeal No. 82–583.

United States Court of Appeals,
Federal Circuit.

July 27, 1983.

William H. Epstein, Nutley, N.J., argued, for appellant. With him on the brief was George M. Gould, Nutley, N.J.

Harris A. Pitlick, Washington, D.C., argued, for appellee. With him on the brief were Joseph F. Nakamura, Sol. and Fred E. McKelvey, Associate. Sol., Washington, D.C.

Robert W. Furlong, Boston, Mass., argued, for intervenor.

Before MILLER, Circuit Judge, COWEN, Senior Circuit Judge, and SMITH, Circuit Judge.

JACK R. MILLER, Circuit Judge.

This is an appeal from the decision of the Patent and Trademark Office ("PTO") Board of Appeals ("board") affirming the rejection under 35 U.S.C. § 103 of claims 1–15 in reissue application No. 003,978. We affirm.[1]

## BACKGROUND

*Procedural Background*

Appellants Farrenkopf and Usategui-Gomez were issued United States Patent No. 4,112,064 (the '064 patent)[2] on September 5, 1978, for "Stabilized Angiotensin I Solutions." Shortly after its issuance, the '064 patent was added to a pending action which the '064 patent assignee, Hoffmann-La Roche Inc., had brought against Travenol Laboratories in the United States District Court for the District of New Jersey for infringement of another patent. Hoffmann-La Roche Inc. contended that Travenol Laboratories was also infringing the '064 patent. Thereafter, on January 16, 1979 (less than two years after their patent had issued), appellants filed application No. 003,978 for reissuance of the '064 patent. Appellants' reissue oath states that they sought reissue under 35 U.S.C. § 251 because, *inter alia,* they had been informed by defendant, as a result of the pending civil action, of the existence of certain prior art not previously considered by the PTO, namely, Rutner et al., *Peptidase Activity of Carrier Proteins Used In Radioimmunoassays,* 15 J. Nuclear Med. 557 (1974) ("Rutner"). They further stated—

14. that this reissue application is being filed to enable the Patent & Trademark Office to reexamine the patentability of the original patent to determine that same is patentable, operative and valid over certain prior art not previously

---

1. The defendant in a district court action for infringement of the patent for which reissue is sought was a protestor below and is the intervenor in this appeal.

2. Issued on application serial No. 770,335, filed February 22, 1977.

considered by the Patent & Trademark Office alone or in combination with the prior art of record, and that this reissue application is filed as a result of the existence of Rutner et al so that the record of prosecution of this reissue application will indicate that the prior art has been considered by the Patent & Trademark Office . . . .

The specification was amended; 7 of the 10 original product and method claims in the patent were amended; and 5 new claims directed to a method were added in the application for reissue.

In April 1979, the defendant Travenol Laboratories filed a protest in the PTO reissue proceeding. On August 15, 1980, the district court action was dismissed in view of a settlement agreement. Under the terms of this agreement, Travenol Laboratories paid Hoffmann-La Roche Inc. a sum of money and further agreed to pay Hoffmann-La Roche Inc. a royalty if the '064 patent was successfully reissued with any claims covering a commercial kit sold or distributed by Travenol Laboratories.

*The Invention*

Helpful information concerning the causes of hypertension in an individual patient can be obtained by the quantitative determination of the amount of Angiotensin I (AI) in a sample of his or her blood plasma. Determination of the AI content in patient blood samples is generally performed by physicians who purchase commercial kits containing the reagents necessary for performing a radioimmunoassay (RIA) for AI. These reagents include a radioiodinated AI tracer (containing radioactively labeled AI) and an AI standard (containing unlabeled AI). In addition, these reagents contain protein carriers to prevent adsorption of various reactants to the walls of glass or plastic containers during the assay. Prior to appellants' invention, enzymes present in the protein carriers of the AI tracers and AI standards would break down the AI and render the test results inaccurate unless the

tracers and standards were stored either at extremely low temperatures (−20°C) or in lyophilized (freeze-dried) form at low temperatures and reconstituted prior to use.

In a conventional RIA assay, an inhibitor is added to a sample of a patient's plasma to prevent the breakdown of AI by plasma enzymes into its lower peptides, and the sample is incubated at appropriate temperatures and pH to cause conversion of a substance present in the plasma to AI. Known amounts of AI tracer and standard are then added to the plasma sample, the radioactivity of which is then measured and quantitatively correlated with the amount of AI in the plasma sample.

Appellants have discovered that AI tracers and standards can be prepared, shipped to users, and stored for long periods of time at room temperature without lyophilizing or freezing if a stabilizer, phenylmethylsulfonylfluoride (PMSF), is added to inhibit the activity of enzymes found in carrier proteins.

Claim 1 is representative:[3]

1. A method for increasing the stability of an Angiotensin I standard solution or composition or a radioiodinated Angiotensin I reagent solution or composition containing buffer and stabilizer systems which method comprises adding to said solution or said composition a minor effective stabilizing amount of phenylmethylsulfonyl fluoride, said solution or said composition being substantially free of any extraneous source of Angiotensin I.

*The Prior Art*

Rutner, *Peptidase Activity of Carrier Proteins Used in Radioimmunoassays,* 15 J. Nuclear Med. 557 (1974), teaches that carrier proteins, generally present in the AI tracer and standard compositions in RIA kits, frequently contain enzymes, as contaminants, which break down the AI in a cleavage pattern "consistent with chymotrypsin or chymotrypsin-like enzyme activity." To overcome this problem, Rutner et

---

**3.** Other claims are directed to specific AI tracer and AI standard compositions which contain PMSF and are "substantially free of any extraneous source of Angiotensin I."

al. suggest three possible solutions, one of which is the inhibition of peptidase activity by the addition of "appropriate inhibitors." The addition of inhibitors, although acknowledged by Rutner to be the most convenient of the three solutions, is not discussed further because it is also considered to be costly and a possible source of error in the RIA procedures. Instead, Rutner et al. recommend the screening of individual batches of protein carrier to obtain only those of low peptidase activity. The reference also discloses test results showing the ineffectiveness of inhibitors TPCK and Trasylol (unrelated to PMSF) to prevent decomposition of AI in tracers and standards.

Khairallah et al., *Plasma Angiotensinases*, 1 Biochem.Med. 1 (1967), disclose the presence of three different angiotensinases in plasma which metabolize AI in vitro and cause it to decompose. One of these angiotensinases (angiotensinase B) is characterized as having "chymotryptic-like activity" and is taught to be inhibited by PMSF. Kodish et al., *Plasma Renin Concentration*, 83 J.Lab.Clin.Med. 705 (1974), de Castro, U.S. Patent No. 3,919,407 (issued in 1975), and de Castro, U.S. Patent No. 3,984,532 (issued in 1976), are all directed to an RIA for the measurement of the amount of AI generated in a plasma sample during incubation and teach the addition of PMSF to plasma prior to the test incubation to prevent the angiotensinase present in the plasma from decomposing the AI produced during the test. The de Castro '407 patent also discloses that PMSF inhibits trypsin and chymotrypsin.

*The Board's Decision*

The board affirmed the examiner's rejection of all the claims under 35 U.S.C. § 103 based on Rutner in combination with (1) Kodish et al. and Khairallah et al. or (2) the de Castro patents and Khairallah et al., stating:

> Rutner et al teach a solution of essentially the same problem addressed by appellants, i.e., the long term stability of Angiotensin I standards and tracers by addition of inhibitor. Rutner et al do not teach the claimed phenylmethylsulfonyl flouride (PMSF) inhibitor. However, Kodish et al, Khairallah et al and de Castro all teach adding PMSF as an inhibitor against angiotensinase, i.e., to prevent the destruction of Angiotensin I, albeit in each instance the addition is to the plasma rather than to the standard as called for here. We fully agree that one skilled in the art, having these references before him, would have found it obvious to substitute PMSF as the appropriate inhibitor in the Rutner et al process with the expectation that it would be effective for long-term stability of Angiotensin I standards and tracers. . . .

## ANALYSIS

### (1) *Prior Art References*

■ Appellants stated at oral argument that the number of enzymes exhibiting "chymotrypsin-like activity" described by Rutner would run in the hundreds of compounds. They argue that, since Rutner et al. never identify the culprit enzymes in carrier proteins which cause instability of AI reagents, the reference would disclose nothing to one of ordinary skill in the art about the identity of the "appropriate inhibitor" to counteract such enzymes. Appellants rely on an affidavit (Overturf II) which, after describing the various angiotensinases present in plasma, states that "the actions of numerous enzymes which degrade Angiotensin I as well as other substances are *differentially* and largely *unpredictably* effected [*sic*] by various inhibitors."

However, we are persuaded that the commonality of chymotrypsin-like enzymatic activity in AI tracers and standards (as disclosed in Rutner) and in plasma (as disclosed in Khairallah et al. for Angiotensinase B), coupled with the fact that PMSF was a known inhibitor of angiotensinases in plasma (both de Castro patents) and of chymotrypsin (de Castro '407), would have established a necessary relationship between such enzymatic activity and PMSF to one of ordinary skill in the art.

Appellants also argue that Rutner et al. teach away from the addition of any inhibitor to AI standards and reagents, referring to (1) the statement in Rutner that "the use of inhibitors can be costly and may also be a potential source of error in radioimmunoassay"; (2) the teaching of Rutner that inhibitors used in plasma samples may be ineffective in inhibiting carrier damage in AI reagents; and (3) the fact that the two particular inhibitors mentioned by Rutner (TPCK and Trasylol) are shown to be ineffective in preventing decomposition of AI in tracers and standards.

 We agree with the board that additional expense associated with the addition of inhibitors would not discourage one of ordinary skill in the art from seeking the convenience expected therefrom. That a given combination would not be made by businessmen for economic reasons does not mean that persons skilled in the art would not make the combination because of some technological incompatibility. Only the latter fact would be relevant. *Orthopedic Equipment Co. v. United States,* 702 F.2d 1005, 1013, 217 USPQ 193, 200 (Fed.Cir. 1983). Here, the secondary references teach that PMSF is *advantageously* added to plasma samples in a conventional RIA prior to the addition of AI standards and tracers. Accordingly, we are persuaded that one skilled in the art would not have considered the potential for error that Rutner tentatively associated with the use of inhibitors to be a significant problem.

The portion of the Rutner reference relied upon by appellants as teaching away from the invention consists of the following:

It is appropriate to differentiate between the action of the peptidases in [protein] carriers which cause "carrier" damage and action of proteolytic enzymes, normally present in plasma or serum, which cause "incubation" damage. Carrier damage may occur in the labeled and the unlabeled antigens during storage at room temperature for brief periods of time and to a lesser extent at refrigerator temperature. In one instance of severe contamination, however, cooling to −20° did not prevent degradation of angiotensin during storage for 20 days. Hence, carrier damage adds to incubation damage and may not be inhibited by addition of specific or nonspecific inhibitors to plasma or serum before incubation.

However, the Solicitor argues that appellants have misinterpreted the above passage and correctly points out that Rutner et al. were merely restating that the damage done to AI standards and tracers during storage ("carrier" damage) cannot be stopped by the addition of inhibitors to the plasma—the damage having already occurred in the AI standards and tracers.

As to the ineffectiveness of TPCK and Trasylol in AI tracers and standards, appellants contend that Tables 6 and 7 of Rutner demonstrate that AI stability is a function of protein carrier batch selection rather than a result of the addition of an inhibitor. However, as pointed out earlier, the particular inhibitors of Tables 6 and 7 are unrelated to PMSF, and the Overturf II affidavit confirms that the effect of different inhibitors, particularly unrelated ones, on an enzyme is not readily predictable. Moreover, the fact that an unrelated inhibitor is ineffective hardly constitutes a convincing teaching away from the use of PMSF in tracers and standards when PMSF was known to be an effective inhibitor of enzymes attacking AI in plasma samples.

(2) *Overturf Affidavit II*

 Appellants argue that the facts set forth in Professor Overturf's Affidavit II demonstrate that short-term RIA inhibition is art-recognized as involving different problems than long-term stabilization of tracers and standards.

In his affidavit of April 15, 1980, Professor Overturf avers, *inter alia —*

that the use of PMSF as an inhibitor of plasma proteases, particularly angiotensinases, in short term plasma radioimmunoassay (RIA) determinations is not predictive or suggestive of the use of PMSF as an inhibitor for the long term stabilization of Angiotensin I (AI) standards and

tracers. . . . There are a number of angiotensinases, so the activity of all of such angiotensinases and the several converting enzymes has to be prevented in order to achieve long term stabilization of Angiotensin I standards and tracers . . . .

However, the affidavit contains no factual support for this statement, such as examples of compounds shown to be effective short-term inhibitors but lacking activity as long-term inhibitors. As to the predictability of long-term AI stability, the board stated that, given the fact that PMSF was known to be an effective inhibitor for preserving AI for *any* length of time, the burden was on appellants to show that it would *not* have been obvious that PMSF would continue to be effective as an inhibitor for longer periods of time.[4] Such a showing is not of record, and, without it, Professor Overturf's statement is entitled to only limited weight. *In re Lindell,* 385 F.2d 453, 456, 155 USPQ 521, 524 (Cust. & Pat.App. 1967).

### (3) *Parsons Affidavit*

In the reissue proceedings below, Travenol Laboratories, protestor (intervenor on appeal), introduced an affidavit by Doctor George Parsons, who was employed by a division of Travenol Laboratories as a group leader in radioimmunoassay kit development. At that time, Travenol argued that the Parsons affidavit constituted evidence of "the public use and sale, prior to applicants' filing date [February 22, 1977], of solutions of Angiotensin I or radioiodinated Angiotensin I stabilized with phenyl methyl sulfonyl fluoride (PMSF)." The affidavit states that "in the late winter of 1976" Parsons was engaged in developing new AI tracers and standards, that he was familiar with Rutner, Fahrney & Gold, 84 J.A.C.S. 997 (1963) (an article the board

considered to be "cumulative at best" in view of Kodish et al. and Khairallah et al.), and Kodish et al.; that he followed the teachings of Rutner and Fahrney et al. to use PMSF as an inhibitor in AI standards and tracers; and that the resulting radioimmunoassay kit was first sold in the United States on June 2, 1976, and has been on sale continuously since that date with only minor modifications.

In response, appellants argued that they had "conceived, made and reduced to practice their invention" prior to January 1, 1976, which is only shortly prior to the "late winter of 1976" time frame set out by the Parsons affidavit as a conception and/or development date of intervenor's radioimmunoassay kit.[5] Appellants also enclosed a declaration pursuant to 37 C.F.R. 1.131 swearing behind the January 1, 1976 date.

The examiner found that appellants' evidence supported their allegation of a reduction to practice on or before January 1, 1976. There was, therefore, no reason to reject the claims under 35 U.S.C. § 102 combined with § 103 on the basis of Parsons' activities.

Now, on appeal, the Solicitor and intervenor argue that, although not prior art themselves, the opinions and actions of Parsons are objective evidence, for purposes of 35 U.S.C. § 103, of what one of ordinary skill, aware of the existing prior art, would have done in view of the art at "the time the invention was made"; indeed, that one of ordinary skill in the art actually concluded that PMSF would be an appropriate stabilizer for AI tracers and standards in RIA kits. The point is also made that the opinions and actions of Parsons occurred when the affiant would have had no motive to distort the truth and at a time which was

---

4. Appellant does not directly take issue with the board's statement "for any length of time," but asserts that the de Castro patents teach that "longer times create possible sources of error." However, a careful reading of de Castro '532 reveals that the time of incubation problem mentioned by de Castro is not related to the use of PMSF, and de Castro '407 does not discuss the time of incubation.

5. *Webster's Third New International Dictionary* (1971) defines "winter" as "the season comprising the months of December, January, and February," so that "late winter" would seem to denote the month of February.

nearly contemporaneous with (just after) appellants' reduction to practice.

 Affidavit evidence submitted in protested reissue proceedings is to be treated in the same manner as if it had been submitted in ex parte proceedings before the PTO. *In re Reuter,*[6] 651 F.2d 751, 756, 210 USPQ 249, 253 (Cust. & Pat.App.1981). Such evidence has been held to be competent to the extent that it refers to matters known to or observed by the affiant prior to or *contemporaneous with* the actual reduction to practice by another in an interference, where it was offered as evidence of the level of knowledge in the art at the time the invention was made. *Peeler v. Miller,* 535 F.2d 647, 652–53, 190 USPQ 117, 121 (Cust. & Pat.App.1976). Although the Parsons affidavit constitutes admissible expert opinion evidence regarding the state of the art as of "the late winter of 1976," the question remains whether "the late winter of 1976" is "contemporaneous" with appellants' actual reduction to practice sometime prior to January 1, 1976. On this, we are satisfied that the Parsons affidavit constitutes some evidence of the level of skill in the art reasonably contemporaneous with appellants' reduction to practice.

Appellants contend that the Parsons affidavit is not persuasive because Parsons failed to appreciate the long-term stability at room temperature achieved by the addition of PMSF to AI reagents. They refer to the package insert of intervenor's RIA kit which specifically discloses that the AI tracers and standards therein are lyophilized, must be reconstituted prior to use, and thereafter must be stored in a freezer at −20°C for long-term storage (greater than two weeks).

 It is well established that a party to an interference must show an appreciation or recognition by the inventor of the invention of the counts to establish a prior actual reduction to practice. *Meitzner v. Corte,* 537 F.2d 524, 190 USPQ 407 (Cust. & Pat.App.1976). However, intervenor here is

not attempting to prove a *prior* actual reduction to practice, but merely to submit evidence of the level of skill in the art at a time shortly after the invention was made. Although Parsons apparently did not, at a time reasonably contemporaneous with appellants' reduction to practice, recognize the advantage principally relied on by appellants, Parsons was, nevertheless, motivated by the prior art teachings to invent a method corresponding to the claimed invention. That Parsons chose to use PMSF to stabilize lyophilized tracers and standards does not detract from the weight to be accorded his work, because the claims are sufficiently broad to cover such use.

 In view of the foregoing, the decision of the board is affirmed.

AFFIRMED.

---

**6.** The CCPA, in *In re Dien,* 680 F.2d 151, 214 USPQ 10 (Cust. & Pat.App.1982), held that it lacked jurisdiction over "no defect" reissue

cases of the type involved in *Reuter.* Nevertheless, the statement in the *Reuter* opinion concerning affidavit evidence is still viable.