**STEWART–WARNER CORPORATION,**
Plaintiff-Appellant,

v.

**CITY OF PONTIAC, MICHIGAN and American Sign & Indicator Corp.,**
Defendants-Appellees.

**Appeal No. 84–1026.**

United States Court of Appeals,
Federal Circuit.

July 18, 1985.

Jack R. Miller, Senior Circuit Judge, dissented in part and filed opinion.

Melvin M. Goldenberg, McDougall, Hersh & Scott, Chicago, Ill., argued for plaintiff-appellant. With him on the brief was Thomas E. Elliott, Jr.

Augustus G. Douvas, Chicago, Ill., of counsel.

William L. Anthony, Jr., Townsend & Townsend, San Francisco, Cal., argued for defendants-appellees. With him on the brief was William J. Coughlin, Harness, Dickey & Pierce, Birmingham, Michigan.

Richard J. St. John, Wells, St. John & Roberts, Spokane, Wash., of counsel.

Before MILLER,* Senior Circuit Judge, SMITH, and NEWMAN, Circuit Judges.

PAULINE NEWMAN, Circuit Judge.

Appeal from final judgment of the United States District Court for the Eastern District of Michigan, holding that claims 1–4 of U.S. Patent No. 3,941,926 (the '926 patent), invented by Gregory Slobodzian, Stanley Zielinski, and Robert Payne, and assigned to Stewart-Warner Corporation, are invalid under 35 U.S.C. § 103 and are not infringed. We affirm the holding of noninfringement and reverse the holding of invalidity.

### The Invention

The claimed invention is a display system such as is used for large scoreboards in sports arenas. The display is a moving video image, of visual quality described as comparable to that of a black and white television screen. In brief, the system receives a television video signal and converts it from analog form to an encoded digital form, stores the encoded signals for a complete video frame in a memory under

---

* Judge Miller assumed senior status on June 6, 1985, but was on active status when this case was submitted.

computer control, and uses these digital signals to control the light intensity of a large number of incandescent lamps, ten thousand and more, arranged in a display matrix such as on a stadium scoreboard.

In accordance with the teachings of the '926 patent, this system is capable of displaying at least eight levels of light intensity (shades of gray) on the scoreboard; any individual lamp can be on, off, or have six or more intermediate levels of light intensity. The result is a picture of higher quality, according to the record, than was theretofore available. The system is claimed, in the broadest claim, as follows:

1. A system for displaying images on a plurality of visual display devices operated by application of a periodic power waveform, including means for applying said periodic power waveform to said system, said display devices arranged in modules to form a full display matrix capable of at least eight levels of light intensity comprising:

a. a source of video signals;

b. a video to digital converter producing digitally coded signals representing said video signals;

c. (means) for receiving and storing a full matrix of said digital signals;

d. means for extracting the stored digital signals;

e. means for decoding the transmitted signals only during selected intervals on said power waveform to produce intensity level information for initiating operation of selected ones of said display devices at each interval, each of said selected intervals corresponding to a display device turn on point for a different level of light intensity;

f. (means for transmitting the extracted signals to said decoding means;

g. means for applying the decoded intensity level information to said display devices; and

h. clock means for operating said extracting means, transmitting means, decoding means and applying means on a real time basis at a data trans-

mission rate sufficiently greater than the frequency of the periodic power waveform that said applying means completely applies the decoded intensity level information to the selected display devices during the occurrence of each power waveform interval

whereby each display device is energized at the proper interval on the power waveform to accurately reproduce the applied intensity level information.

Claims 2 through 4 are dependent claims, adding various limitations to clauses c or d of claim 1.

Stewart-Warner's research into and design of scoreboard displays apparently covers many years. An earlier system for the display of moving video images on stadium scoreboards is described in Stewart-Warner's U.S. Patent No. 4,009,335, inventors Payne, Slobodzian, Zielinski, and Ravanesi (the '335 patent), which the record describes as a forerunner of the '926 invention. As an improvement over still earlier display systems, most of which required the use of direct current to obtain variations in illumination, the '335 patent teaches a way to use digital signals and alternating current to turn specific light bulbs on and off in a way that produces up to four shades of gray on the display. The '335 system employs a video-to-digital converter to scan video signals received and to analyze the light intensities which they represent at a given time frame. Each video time frame is assigned one of four light intensity values, and this information is converted into digital form. Each light bulb has a separate address on the scoreboard; a computer receives corresponding addressing information with each encoded digital signal, so that the desired intensity is transmitted to the proper location on the display matrix. The system uses a semiconductor switch called a triac to turn the light bulbs on and off rapidly for a portion of the alternating current power cycle. The '335 patent teaches the circuitry to turn the light bulbs on and off at intervals of a full cycle, a half cycle, a quarter cycle,

or not at all, and uses a threephase alternating current power supply. The number of data signals that are transmitted during each half cycle of the power waveform determines which one of the four shades of gray of which the system is capable will be displayed on the scoreboard.

The invention of the '335 patent was embodied in a scoreboard installed by Stewart-Warner at the Kansas City Chiefs' Arrowhead Stadium in 1972. This scoreboard was held in prior litigation to have been "on sale" more than one year before the filing dates of both the '335 and '926 patents, and served on this basis to invalidate the '335 patent and, until reversed on appeal, the '926 patent. The scoreboard's continuing effect on the validity and interpretation of the claims of the '926 patent is the core of the case at bar.

In 1973 Stewart-Warner's engineers began to investigate the development of a system that could display eight or more shades of gray in order to achieve a more realistic and higher quality image than was produced at Kansas City. If it were attempted to use the system of the '335 patent, as in the Kansas City scoreboard, to transmit eight levels of illumination, the phase data would overlap and some data intended for the light bulbs of one phase would instead go to the light bulbs of another phase, thus blurring the image. The invention disclosed and claimed in the '926 patent solved this problem, and enabled a display system that produces a moving video image in eight and more shades of gray.

### History of the Litigation

The first phase of this litigation began on September 13, 1979, when Stewart-Warner sued the City of Pontiac, Michigan and the American Sign and Indicator Corporation (AS & I) in the District Court for the Eastern District of Michigan, asserting infringement of four patents. Pursuant to stipulation the complaint was dismissed with respect to two patents, and in July 1981 trial was held involving the '335 and '926 patents. At the conclusion of that trial the district court granted appellees'

motion for a directed verdict that both the '335 patent and the '926 patent were invalid for violation of the "on sale" prohibition of 35 U.S.C. § 102(b), because of their embodiment in the Kansas City scoreboard. *Stewart-Warner Corp. v. City of Pontiac*, 213 USPQ 453, 461 (E.D.Mich. 1981).

In September 1983 the United States Court of Appeals for the Sixth Circuit, in a 2–1 decision, affirmed the decision of the district court with respect to the '335 patent but reversed with respect to the application of section 102(b) to the '926 patent. *Stewart-Warner Corp. v. City of Pontiac, Michigan*, 717 F.2d 269, 219 USPQ 1162 (6th Cir.1983). The appellate court observed that "[n]o one contests the fact that the '926 patent envisioned a scoreboard using very different electronic circuitry, resulting in the production of a much higher quality image than the Kansas City scoreboard." *Id.* at 277, 219 USPQ at 1169. The appellate court declined to express an opinion with respect to obviousness under section 103 or infringement, since these issues had not been decided by the district court. *Stewart-Warner*, 717 F.2d at 271, 219 USPQ at 1164.

On remand, the district court held claims 1–4 of the '926 patent to be invalid under 35 U.S.C. § 103, on the basis that they represented an "obvious ... modification of the Kansas City '335 design." The district court determined that clauses *a* through *g* of claim 1 of the '926 patent read on the '335 patent, which it equated with the Kansas City scoreboard, and that the only distinguishing feature of the '926 patent was clause *h* referring to "clock means". The Kansas City system used separate clocks to read and write from the memory at the display board, whereas the '926 system taught a single clock to synchronize transmittal of data to and from the memories. The district court found as fact that the Patent Office was not aware of the "close relationship between the write clock of the Kansas City scoreboard and the master clock 702 of the '926 display system" when it granted

the '926 patent, and described the systems as "differing only as to two clocks versus one", a difference that the court considered would have been obvious.

### Validity Under 35 U.S.C. § 103

Stewart-Warner appeals from the district court's holding of invalidity of the '926 patent based on obviousness. Stewart-Warner argues that the court failed to consider the invention as a whole, as required by section 103, but limited its analysis of obviousness to claim clause *h;* that the court ignored the law of the case; that it impermissibly limited the scope of clause *h* to "single clock full synchronization"; that it erred by considering events subsequent to the time the invention was made as prior art or as evidence of the level of skill in the art; and that it ignored that the contemporaneous prior art taught away from the invention. We review these assertions in accordance with the guidelines to section 103 determinations set forth in *Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545, 148 USPQ 459 (1966).

The district court found Stewart-Warner's Kansas City scoreboard to be the most relevant prior art. The court also found pertinent Conrac's contemporaneously developed five shades-of-gray scoreboard for the Buffalo Bills' Stadium, and U.S. Patent No. 3,740,570 issued to Kaelin for "Driving Circuits for Light Emitting Diodes", of which much was made by the defendants because this patent was not cited by or to the examiner. The five U.S. patents cited during the '926 patent prosecution as prior art, and several other references, were also the subject of extensive discussion at trial, including expert testimony.

■ We agree with the district court that no reference is as pertinent to the claims of the '926 patent as is the Kansas City scoreboard system, the structure and operation of which is the subject of the '335 patent. The district court emphasized that although the examiner knew the '335 patent was embodied in the Kansas City scoreboard, the scoreboard's detailed drawings were not before the examiner. After re-

viewing the record, we agree with appellant that the scoreboard drawings were no more relevant to the claims at issue than the '335 patent and the art of record, and conclude that the district court's finding to the contrary was clearly erroneous.

■ In the first trial the district court had found that the only significant distinction between the four shades-of-gray "Kansas City '335 design" and the '926 patent claims was the statement in the '926 claim preamble that the display was "capable of at least eight levels of light intensity". On appeal the Sixth Circuit expressly rejected this holding. The Sixth Circuit construed claim clause *h* of the '926 patent as claiming "a method to transmit the light intensity data from the computer to the scoreboard at a sufficiently rapid rate to completely address the lamps during a given interval." *Stewart-Warner*, 717 F.2d at 278, 219 USPQ at 1169. The Sixth Circuit held that clause *h,* construed in light of the claim preamble and the specification, described "novel electronic circuitry" and "a much different method of transmitting the data than the Kansas City scoreboard", and that this different method was necessary in order to produce eight shades of gray. *Id.* The mandate of the Sixth Circuit is binding upon the district court. 1B J. Moore, J. Lucas, & J. Corrier, Moore's Federal Practice, ¶ 0.404[10] (2d ed. 1984); *see also Smith Int'l, Inc. v. Hughes Tool Co.*, 759 F.2d 1572, 1576–77, 225 USPQ 889, 891–92 (Fed.Cir.1985) and cases therein.

On remand, the district court agreed with the Sixth Circuit that the Kansas City system could not decode the transmitted data fast enough to accommodate at least eight discrete shades of gray on the scoreboard. The district court found, however, that the "clock means" of claim clause *h* of the '926 patent could be construed as covering any clock means sufficient to handle data for eight shades of gray, and concluded that the display system of the Kansas City scoreboard was theoretically capable of performing this function. This finding is contrary to the decision of the Sixth

Circuit, and cannot be sustained. The Sixth Circuit held that both the result achieved by the '926 patent, and the method of achieving it, differed from that of the Kansas City scoreboard. *Stewart-Warner,* 717 F.2d at 278, 219 USPQ at 1169.

■ We sit as successor to the Sixth Circuit solely because of the transfer in 1982 of appellate jurisdiction by the Federal Courts Improvement Act of 1982, Pub.L. No. 97–164, § 403(e), 96 Stat. 25, 58 (1982). The prior appellate review and determination of certain issues, including claim construction, foreclosed the opportunity to redetermine those issues. Neither party has demonstrated that the evidence presented on remand was substantially different, or that manifest injustice required an exception to the law of the case doctrine. *See Central Soya Co., Inc. v. Geo. A. Hormel & Co.,* 723 F.2d 1573, 1580, 220 USPQ 490, 495 (Fed.Cir.1983) and cases therein, citing *White v. Murtha,* 377 F.2d 428, 431 (5th Cir.1967).

■ In its analysis under 35 U.S.C. § 103, the district court concluded that the invention of the '926 patent was limited to the use of a single synchronous clock to achieve eight shades of gray, and that this was the only difference from the Kansas City system which writes into and then reads from the memories with two different clocks. This also is contrary to the mandate of the Sixth Circuit. The clock means of the '926 patent claims, as described in claim clause *h,* operates to extract, transmit, decode, and apply data on a real time basis, at a rate sufficiently greater than the frequency of the periodic power waveform—such that the decoded intensity level information is completely applied to the display devices during the occurrence of each power waveform interval; this is not taught by the prior art.

The Sixth Circuit found that the increase in shade-of-gray capacity in the '926 patent is achieved by the separation of the data for each phase, whereby the data can be transmitted to the phase-powered lamps on a real time basis, in accordance with claim clause *h.* The blurring of the image, inher- ent in the Kansas City system when data for eight or more shades of gray are transmitted, is avoided by the '926 patent's teaching of transmitting the shade-of-gray pulses on a separate channel for each phase. As the Sixth Circuit observed, this use of three output channels serves to reduce overload and overlaps in data transmission. *Stewart-Warner,* 717 F.2d at 278, 219 USPQ at 1169.

The synchronous clock means operates in conjunction with the recirculating scoreboard memories, as provided in claim clause *h.* Consistent with the prior conclusion of the Sixth Circuit, there was testimony at trial that the '926 patent embodied a completely different mode of operation for the recirculating memories, compared with the Kansas City system. Data are obtained from each memory level at any time or are written into the register whenever new data are available, providing a continuous flow of data to the lamps. As the record shows, the recirculating memories of the Kansas City system are exclusively in either a write mode or a read mode, reducing the speed with which they can transfer data. Stewart-Warner insists that it is not material whether a single clock, or more than one clock, is used; and we agree that neither the '926 claims nor specification requires such limitation.

Although the district court found that the drawings of the '335 patent did not "effectively advise" the examiner of the circuitry and operation of the memories of the Kansas City scoreboard, a finding with which Stewart-Warner takes issue, cited prior art such as Sharpless also disclosed the use of such memories in a display system. Stewart-Warner does not claim to have invented recirculating memories.

Another difference discussed and discounted by the district court is in the operation of the display interface. The Kansas City scoreboard employs a single buffer at the display interface, while the '926 system employs two buffers—one transmitting to the board while the other is receiving from the computer. The data from the Kansas City computer memory is inputted in paral-

lel to one set of registers for each bit line and outputted serially; the data from the '926 computer memory is inputted through two sets of registers for each bit line. The trial court held this difference at the display interface to have been obvious because the Kansas City system used double buffers at the video interface. We do not agree with this conclusion. The double buffers in the prior art scoreboard perform a different function at the video interface, and the prior art does not suggest their use at the display interface. The district court's finding to the contrary is clearly in error.

■ The trial court found the use of three output channels in the '926 patent in place of the single channel of the Kansas City scoreboard to be a "matter of mere routine engineering to avoid the problem of overloaded data in transit from the memory to the board which might have resulted from the increase in the number of shades of gray from 4 to 8." There was expert testimony in support of this finding; but we observe that the same expert who testified that the use of three separate output channels was "routine in handling the decoding as an isolated instance," stated that "in combination with other elements" it would not necessarily be routine. The invention must be viewed as a whole. *Carl Schenck, A.G. v. Nortron Corp.*, 713 F.2d 782, 785, 218 USPQ 698, 670 (Fed.Cir.1983).

In addition to the Kansas City scoreboard, the trial court relied as prior art on the Conrac scoreboard and the Kaelin patent. The Conrac scoreboard was installed at about the time the '926 system was being developed, and was capable of displaying five shades of gray, using alternating current to light incandescent lamps. Conrac used a completely different approach: instead of varying the phase angle as in the Kansas City and '926 systems, the Conrac design used cycle stealing (counting the number of power half waves) to display five variations of light intensity. There was uncontroverted testimony that the cycle stealing technique proved unworkable

when Conrac later attempted to expand its display to more than five shades.

The district court found that the Kaelin patent was relevant prior art. Kaelin was concerned with simplified circuitry for the operation of light emitting diodes, to provide alpha-numeric readout on a display apparatus. Kaelin, like other cited references, taught that if one wanted to vary the light intensity of the display one would vary the driving current pulse widths. This variation was possible because Kaelin was using direct current; the reference neither teaches nor suggests that the Kaelin circuitry, which teaches that brightness is controlled by adjusting the pulse duration, is usable under the restraints of alternating current.

The district court found that the Kaelin patent "provides a single master clock to write digital data into the recirculating memory and read this data out of the memory in a way very similar to that used for the recirculating memory of the '926 patent." While Stewart-Warner argues that Kaelin makes no explicit reference to the shift register's recirculating ability, there was conflicting testimony as to whether the Kaelin shift register was capable of so functioning. The district court's conclusion concerning the use of a master clock in the Kaelin system was also based on conflicting testimony, and we observe that Kaelin also teaches the use of a "slave clock" which drives a shift register. Our review of Kaelin turns on the applicability of its teachings to the '926 patent, in combination with the Kansas City scoreboard. We conclude that it would not have been obvious to take the small devices and the direct current power source of Kaelin and adapt them to an alternating current power source and a large scoreboard, in company with the other differences between the '926 claims and the prior art. AS & I has not met its burden of proof on this essential point. *See* 35 U.S.C. § 282.

■ The record shows that Stewart-Warner has installed at least fourteen scoreboards embodying the invention of the '926 patent, all producing more than

eight shades of gray. Evidence of commercial success is pertinent to the issue of obviousness. *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538–39, 218 USPQ 871, 879 (Fed.Cir.1983). The district court remarked that Stewart-Warner's competitors were "successful in building eight shades-of-gray scoreboards in the mid-1970's without the benefit of the Kansas City drawings". Development by others may also be pertinent to a determination of the obviousness of an invention, *Concrete Appliances Co. v. Gomery*, 269 U.S. 177, 184–85, 46 S.Ct. 42, 45, 70 L.Ed. 222 (1925); *In re Farrenkopf,* 713 F.2d 714, 720, 219 USPQ 1, 6 (Fed.Cir.1983); but the evidence presented was of activities occurring well after the filing date of the '926 patent application, and was not shown to apply to the time the invention was made, as required by 35 U.S.C. § 103.

■ The trial court had found the level of ordinary skill in the art to be high. It found that all of the named inventors were graduate electrical engineers, that several had engineering master's degrees, and that most had several years of experience in the fields of digital circuit design, computer programming, computer systems design, and digital display systems design. The same was found of AS & I's employees responsible for designing the Pontiac Silverdome scoreboard. Although section 103 is not concerned with the actual skill of the inventors—whose skill may be extraordinary—but rather with the level of ordinary skill in the art, Stewart-Warner's objection is that the trial court considered subsequent events as evidence of the level of skill in the art. The impropriety of such evidence of later developments is magnified in the context of rapidly evolving technology. The district court did not state its degree of reliance on subsequent events or on its measure of the level of skill in the art. But even assuming the level of ordinary skill in the art was "very high" at the time the invention was made, that fact does not alter our conclusion as to the nonobviousness of the '926 invention.

Stewart-Warner does not assert that it invented synchronous clocks, recirculating memories, and double buffers. But the combination of these and other elements into a scoreboard system to produce the eight shades of the '926 claims is not taught by the prior art. The Kansas City system is not capable of producing eight or more levels of illumination. The means of the '926 patent to avoid data overlap, essential to enlarging the available levels of illumination beyond the capability of the Kansas City scoreboard, are not suggested in the prior art. The Conrac scoreboard and the Kaelin reference do not fill the gaps in the prior art teachings. Viewing the invention as a whole, and applying the consistent standards appropriate to determinations of obviousness, we conclude as a matter of law that the prior art would not have made the invention of the '926 patent obvious to one of ordinary skill in this art at the time the invention was made. We reverse the decision of the district court which held claims 1–4 of the '926 patent invalid under 35 U.S.C. § 103.

### Infringement

■ Characterizing that portion of its opinion dealing with infringement as *dicta,* the district court found the '926 patent to be not infringed by appellees' Pontiac Silverdome scoreboard. Literal infringement requires that the accused device embody every element of the claim. *Builders Concrete, Inc. v. Bremerton Concrete Products Co.,* 757 F.2d 255, 257, 225 USPQ 240, 241 (Fed.Cir.1985). If the requirements of literal infringement are not met, infringement may still be found if the structures are equivalent. *Id.* at 5. The classical test for equivalence is whether the accused device "performs substantially the same function in substantially the same way to obtain the same result." *Graver Tank & Mfg. Co., Inc. v. Linde Air Products Co.,* 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097, 85 USPQ 328, 330 (1950) (quoting *Sanitary Refrigerator Co. v. Winters,* 280 U.S. 30, 42, 50 S.Ct. 9, 13, 74 L.Ed. 147, 3 USPQ 40, 44 (1929) ).

AS & I conceded that clauses *a* through *g* of claim 1 of the '926 patent read on the Pontiac Silverdome. However, these claim elements were conceded by Stewart-Warner to read on the unpatented Kansas City system, whose teachings are available to all. In view of these concessions, the district court's analysis was directed to whether the Silverdome scoreboard utilized claim element *h*, or its equivalent. Construction of element *h* of claim 1, a "means plus function" element, is governed by 35 U.S.C. § 112, sixth paragraph, to wit:

An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

This instruction was followed by the Sixth Circuit in construing the claims. *Stewart-Warner*, 717 F.2d at 278, 219 USPQ at 1169. *See also P.M. Palumbo v. Don-Joy Co.*, 762 F.2d 969, 974–976 (Fed.Cir.1985); *D.M.I., Inc. v. Deere & Co.*, 755 F.2d 1570, 1575, 225 USPQ 236, 239 (Fed.Cir.1985); *Radio Steel & Mfg. Co. v. MTD Products, Inc.*, 731 F.2d 840, 848, 221 USPQ 657, 663 (Fed.Cir.1984); *Hale Fire Pump Co. v. Tokai, Ltd.*, 614 F.2d 1278, 1282–83, 205 USPQ 123, 126 (CCPA 1980).

The district court found that the only structure described in the specification of the '926 patent which corresponds to the clause *h* "clock means" is single clock full synchronization. This is in accord with the court's finding that the only distinguishing aspect of the '926 invention was the "use of a single clock full synchronization to handle the additional amount of data required to display images of eight rather than four shades of gray", thus requiring only one full frame recirculating-type memory at the display board, a finding not in accord with the mandate of the Sixth Circuit, as discussed *supra*. The district court found that the Silverdome did not use this improvement or a functional equivalent there-

of, but instead used a bigger computer and more hardware.

Stewart-Warner criticizes the district court for "rewriting" its claims to include the "limitation" of single clock full synchronization, and for failure to apply the law correctly as it pertains to prosecution history estoppel. In particular, Stewart-Warner argues that it specifically eliminated from the claims the requirement of single clock full synchronization, by amendment during prosecution of the '926 application, and that none of the claims is so limited. We agree with Stewart-Warner that the trial court clearly erred in interpreting the '926 claims as restricted to single clock full synchronization. This restriction is not required by the specification or the prosecution history. The number of clocks used to achieve synchronization of the various portions of the system is not restricted in clause *h*, and there is no teaching in the specification that it is material whether one or more clocks is used.

It is however material whether all of the provisions of claim clause *h*, or their equivalent, are met by the Silverdome scoreboard. At trial both sides offered evidence on the issue of whether the Silverdome system, as well as the Kansas City system, store and extract the digital signals "on a real time basis" in the scoreboard memories, as required by claim clause *h*. Implicit in the district court's finding that "the Silverdome scoreboard also has a significant delay similar to that in the Kansas City scoreboard system" is the court's understanding that the Silverdome scoreboard memories are not operated on a real time basis in the strict electronic sense taught and claimed in the '926 patent, although the speed at which they operate must be sufficient to allow the transmission of at least eight shades-of-gray data to the display modules. To the extent the number of clocks is relevant to the infringement issue, it is in relation to the operation on a real time basis of the Silverdome memories. Whereas the '926 display system employs a single clock in conjunction with the scoreboard memories in order

**1572**

to write into and to read from the shift registers in real time, the Silverdome was found by the district court to operate, i.e., in other than real time, with two asynchronous clocks writing into and then reading out of the double buffer-type RAMs. This finding, on which the evidence was conflicting, has not been proven to be clearly erroneous. Because a structure that does not operate in real time cannot be found equivalent to one that does in this case, the clock means of the Silverdome scoreboard is not the equivalent of that set forth in claim clause *h* and Stewart-Warner did not carry its burden of proof on the infringement issue.

The critical importance of real time is elucidated in the '926 patent prosecution history. Before allowance, clause *h* of claim 1 read simply as follows: "clock means for causing synchronous operation of said system". The phrase "on a real time basis" was one of several changes made to clause *h* in order to gain allowance of the claims; Stewart-Warner cannot now recapture the original broader scope of its claims.

The real time limitation of clause *h* also distinguished this claim from the Kansas City system, and thereby contributed to the validity of the '926 patent over the prior art Kansas City system. The range of equivalents asserted to include the Silverdome system, which did not operate on real time, and the means of clause *h* of '926 patent claims, cannot be supported when, as here, that range would encompass the prior art. In the present case, the asserted range would encompass the prior art at the very point at which the '926 claims distinguish from that prior art. *Thomas & Betts Corp. v. Litton Systems, Inc.,* 720 F.2d 1572, 1580, 220 USPQ 1, 6 (Fed.Cir.1983); *Hughes Aircraft Co. v. United States,* 717 F.2d 1351, 1362, 219 USPQ 473, 481 (Fed. Cir.1983). On this basis, we affirm the district court's finding that the claims of

the '926 patent are not infringed by the Silverdome scoreboard.

*Conclusion*

We have reviewed all the arguments and issues raised by both sides, including appellees' argument that the claims do not comply with 35 U.S.C. § 112, in which we find no merit. We affirm the district court's judgment that the Pontiac Silverdome scoreboard does not infringe claims 1–4 of the '926 patent. We reverse the judgment holding the '926 patent invalid.

Each party will bear its own costs.

AFFIRMED IN PART and REVERSED IN PART

JACK R. MILLER, Senior Circuit Judge, dissenting in part.

I do not agree that this court is bound by the law of the case on the basis of the decision of the Sixth Circuit (in *Stewart-Warner Corp. v. City of Pontiac,* 717 F.2d 269, 219 USPQ 1162 (6th Cir.1983)) that the '926 patent is not invalid for anticipation. Although some deference must be given the Sixth Circuit, this should not be expanded to law of the case effect where the decision of the Sixth Circuit was clearly erroneous[1] and would work manifest injustice. *See Central Soya Co. v. Geo. A. Hormel & Co.,* 723 F.2d 1573, 1580, 220 USPQ 490, 495 (Fed.Cir.1983); *Short v. United States,* 661 F.2d 150, 154, 228 Ct.Cl. 535 (1981), *cert. denied,* 455 U.S. 1034, 102 S.Ct. 1738, 72 L.Ed.2d 153 (1982); *Northern Helex Co. v. United States,* 634 F.2d 557, 561, 225 Ct.Cl. 194 (Ct.Cl.1980).

My principal difficulty with the majority opinion is that it effectively changes the plain language of the preamble, "full display *matrix* capable of at least eight levels of light intensity" (emphasis supplied), to "*system* capable of at least eight levels of light." Reading this changed language into limitation "h" simply insures validity of the '926 patent, because the Kansas City system is incapable of relaying eight levels

1. See the opinion of Circuit Judge Kennedy dissenting on this issue in that case. 717 F.2d at 279. The claim construction of the 2–1 majority opinion is clearly erroneous as will be shown *infra.*

to the matrix; whereas, if the preamble is construed in accordance with its plain language, the Kansas City system, which has a matrix with the "eight levels" capability, is prior art that renders the '926 patent invalid. If Stewart-Warner wished its claims to be limited to a "system" capable of displaying eight levels, it would have said so, and it is not for this court to do it, albeit in the garb of a person of ordinary skill.

Accordingly, I would hold the '926 patent invalid. This moots the infringement issue.