PITNEY BOWES, INC., Plaintiff and Counterclaim, Defendant,

v.

HEWLETT–PACKARD COMPANY, Defendant and Counterclaim Plaintiff.

No. Civ. 3:95CV01764AVC.

United States District Court, D. Connecticut.

March 23, 1998.

Michael J. Dorney, Jacqueline D. Bucar, Tyler, Cooper & Alcorn, New Haven, CT, Michael V. Ciresi, James L. Harlow, Jan M. Conlin, Thomas L. Hamlin, Robins, Kaplan, Miller & Ciresi, Minneapolis, MN, for plaintiff.

Thomas J. Rechen, James G. Green, Jr., Pepe & Hazard, Hartford, CT, Jonathan A. Marshall, John J. Lauter, Jr., Steven I. Wallach, Pennie & Edmonds, New York City, for defendant.

### RULING ON THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

COVELLO, Chief Judge.

This is an action for infringement and damages brought pursuant to 35 U.S.C. § 271(a). It concerns the alleged infringement of a patent describing a method for generating printed images. The defendant has now filed the within motion for summary judgment, claiming that it does not infringe the plaintiff's patent since the accused devices do not employ "spots of different sizes."

The sole issue presented is whether the defendant's printers employ "spots of different sizes" as described in United States Patent 4,386,272 (the '272 patent). For the reasons hereinafter set forth, the court concludes that the phrase "spots of different sizes" as used in the '272 patent means light spots of various sizes. Since it is undisputed that the accused devices do not employ light spots of different sizes, the defendant's motion for summary judgment (document no. 178) is granted.

---

1. *See* 35 U.S.C. § 112. An apparatus claim is construed to cover the corresponding structure described in the specification. *Texas In-*

### FACTS

Examination of the complaint, patent records, exhibits, Rule 9(c) statements, and supplemental materials accompanying the motions for summary judgment, and the responses thereto, discloses the following undisputed material facts.

The plaintiff, Pitney Bowes, Inc. (hereinafter "PB"), is a Delaware corporation. The defendant, Hewlett–Packard Company (hereinafter "HP"), is a California corporation.

On March 4, 1981, PB filed patent application Ser. No. 240,532 with the United States Patent and Trademark Office (PTO). Claims 15 and 16 of this application would eventually become claims 1 and 2 of the '272 patent.

On September 23, 1981, the patent examiner rejected claims 15 and 16 of the '532 application on the grounds that the specification was insufficient to enable one of ordinary skill in the art to practice the invention.[1] PB responded that the application contained an extensive description of the apparatus which sufficiently delineated its operation. In January 1982, apparently unpersuaded by PB's arguments, the examiner issued a second office action which reiterated the rejection of claims 15 and 16 of the '532 application.

On March 2, 1982, representatives from PB met with the examiner to discuss the application. As a result of the meeting, the examiner changed his position relating to the patentability of claims 15 and 16 and agreed with PB that the specification adequately described the invention. On April 12, 1982, the examiner issued a Notice of Allowance for claims 15 and 16.

On June 22, 1982, PB filed application Ser. No. 391,029 (the '029 application), a continuation of the '532 application. The '029 application contained claims 15 and 16 from the '532 application in addition to five new claims. On March 7, 1983, a

*struments v. U.S. Int'l Trade Comm'n,* 805 F.2d 1558, 1562 (Fed.Cir.1986).

Notice of Allowance issued for all of the claims of the '029 application. The cover sheet of the Notice contained a handwritten note indicating that, pursuant to § 606.01 of the Manual of Patent Examining Procedure (M.P.E.P.), the examiner changed the title from "Apparatus and Method for Correcting Imperfections in a Polygon Used For Laser Scanning" to "Apparatus and Method for Generating Images by Producing Light Spots of Different Sizes." On May 31, 1983, the PTO granted PB United States Patent 4,386,272 (the '272 patent).

As disclosed and claimed in the '272 patent, the invention describes an apparatus and a method for generating printed images by producing light spots of different sizes. Specifically, the technology is designed for application in a laser printing device.

Laser printers, such as the accused devices manufactured by HP in the instant case, convert electronic information into hard copy representations of words and numbers. They function by directing laser light onto a photoreceptor. A photoconductive surface, such as the surface of a drum, is evenly covered with an electrical charge. When the laser light strikes the drum, it dissipates a small area of the charge on the drum surface. These discharged areas attract toner, which is then transferred from the drum to the paper to create the final permanent image. Each image, whether it be a letter or a number, is composed of hundreds or thousands of these small spots.

Historically, spots of the same size were utilized to produce printed images. The result of this approach was that the corners and edges of many characters had a stair-stepped effect, which is commonly referred to in the printing industry as the "jaggies" problem. The '272 patent describes a technique for creating spots of different sizes. The specification of the '272 patent teaches that this approach can be used "to avoid roughened edges and improve character formation."

The PB inventors achieved this result by employing the device shown in Figure 1 of the '272 patent (see Exhibit 1). A laser source [10] sends a beam of light through a modulator [16] and a series of optical elements [20, 22, and 24] toward a rotating multi-faceted polygon mirror [26]. As the mirror spins, multiple light beams [12] are reflected toward the photoreceptor [32]. Each beam strikes the photoreceptor at a different location, causing the formation of a small discharged area on the drum. Toner is attracted to each of these discharged areas and the image is transferred to paper.

The '272 patent teaches that spots of different sizes can be formed by one of two methods. In an embodiment which employs a single laser source, "the intensity modulator could be used for control of spot size by varying the intensity [of the beam of light]." Alternatively, the invention "can also employ two power sources using parallel laser beams with each of the beams being of a different diameter and corresponding spot size." These different applications are respectively referred to as the one laser and two laser embodiments of the '272 patent.

Claims 1, 2, and 3 of the '272 patent reference the contested phrase "spots of different sizes." They read

1. A method for producing on a photoreceptor an image of generated shapes made up of spots, comprising: directing a plurality of beams of light toward a photoreceptor, each beam of light generating a spot on the photoreceptor and controlling a parameter of the light beams to produce *spots of different sizes* whereby the appearance of smooth edges are given to the generated shapes.

2. The method of claim 1 wherein the parameter controlled is light beam intensity.

3. Apparatus for producing on a photoreceptor an image of generated shapes made up of spots, comprising: means for directing a plurality

of beams of light toward a photoreceptor to generating a plurality of spots on the photoreceptor and means for generating *spots of different sizes* whereby the appearance of smooth edges are given to the generated shapes. (emphasis added)

It is undisputed that the accused HP printers use the same prior art light scanning system as that shown in Figure 1 of the '272 patent. The HP printers employ light from a single laser source which is reflected off a polygonal mirror to a photoreceptor mounted on a drum. However, instead of adjusting either the beam's intensity or diameter, as is described in the '272 patent, the accused printers solve the "jaggies" problem by modifying the duration of time the laser beam is on. The HP printers employ laser light spots of one size which are turned on and off for different periods of time. Beams which are on for a longer period of time create larger discharged areas on the photoreceptor. By modifying the amount of time a beam is on, the HP printers create different sized discharged areas on the photoreceptor. These areas translate into different sized printed dots, which give the final image a smoother appearance.

In 1990, PB notified HP that several of HP's marketed laser printers infringed the claims of the '272 patent. This action followed.

## STANDARD

Summary judgment is appropriately granted when the evidentiary record reveals that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). In determining whether the record presents genuine issues for trial, the court must view all inferences and ambiguities in a light most favorable to the non-moving party. *See Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.), *cert. denied*, 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991). A plaintiff raises a genuine issue of material fact if "the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Rule 56(c) "provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Liberty Lobby*, supra, at 247–48, 106 S.Ct. 2505. The Supreme Court noted that:

Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*Celotex v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims ... [and] it should be interpreted in a way that allows it to accomplish this purpose." *Celotex*, supra, at 323–24, 106 S.Ct. 2548. In a case of patent infringement, summary judgment is appropriate when comparison of the accused device and the claim reveals that there is an absence of disputed material fact. *Chemical Eng'g Corp. v. Essef Indus. Inc.*, 795 F.2d 1565 (Fed.Cir.1986).

## DISCUSSION

### I

### Claim Construction

"The construction of a patent, including the terms of art within its claim, is exclusively within the province of the court." *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 116 S.Ct. 1384, 1386, 134 L.Ed.2d 577 (1996). In determining the meaning of a claim, the court first examines the intrinsic evidence of the record, including the claims, specification, and the prosecution history. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed.Cir.1996). Intrinsic evidence is

"the most significant source of the legally operative meaning of the disputed claim language." *Id.* at 1582. If the intrinsic evidence does not sufficiently resolve ambiguities, then the court may consider extrinsic evidence, including expert and inventor testimony, in order to arrive at a "proper understanding of the claims." *Id.* at 1583.

### 1. *Intrinsic Evidence*

#### a. Language of the Claims

HP first argues that the meaning of the phrase "spots of different sizes" as used in the claims of the '272 patent is ambiguous. They contend that the term "spot" can mean either a light spot generated by the laser beam or a discharged region on the photoreceptor. HP argues that "the claim language alone does not reveal its intended meaning."

PB responds that the claim language clearly indicates the term "spots" means "discharged regions on the photoreceptor which attract toner." They argue that the claims reveal that "spots of different sizes" give rise to "generated shapes" which have the appearance of "smoothed edges." They contend that since "a single laser beam projected spot … will not result in generated shapes having the appearance of smoothed edges," the word "spot" must refer to discharged areas on the photoreceptor.

█ Interpreting the claim language is of primary importance. The "language of the claims frames and ultimately resolves all issues of claim interpretation." *Abtox, Inc. v. Exitron Corp.,* 122 F.3d 1019, 1023 (Fed.Cir.1997). Claim terms are to be given their ordinary and customary meaning, unless it is apparent that the inventor expressly intended a different meaning. *Hoechst Celanese Corp. v. BP Chems. Ltd.,* 78 F.3d 1575, 1578 (Fed.Cir.), *cert. denied,* 519 U.S. 911, 117 S.Ct. 275, 136 L.Ed.2d 198 (1996). When reviewing claim language, a court must apply the "normal rules of syntax" and consider the context of the claim. *Eastman Kodak Co. v. The Goodyear Tire and Rubber Co.,* 114 F.3d 1547, 1553 (Fed.Cir.1997).

In the instant case, the plain language of the claims does not unambiguously support either proposed definition of the phrase "spots of different sizes." As used in the claims of the '272 patent, the term "spot" could mean either light spots or discharged areas on the photoreceptor. The relevant dictionary definition for the word "spot" is "any small portion of a surface differing from the rest." *See* Funk and Wagnall, Standard College Dictionary (1963). This definition alone does not differentiate between the two proposed definitions. Additionally, applying the normal rules of syntax to the claims do not clearly delineate the meaning of the word. For example, the phrases "each beam of light generating a spot" and "controlling a parameter of the light beams to produce spots of different sizes" could be construed to mean either spots of light or discharged areas on the photoreceptor.

Further, PB's assertion that shapes with smoothed edges can not be generated by light spots is not determinative of the meaning of the terms "spots." The claims are not directed toward the generated shapes themselves, but rather a method of making those shapes (Claims 1 and 2) or an apparatus for generating those shapes (Claim 3). The formation of different sized light spots is the first step in the process which gives rise to the shapes. Thus, the shapes are generated by the formation of light spots.

The claim language does not plainly reveal whether the term "spot" means a light spot or a discharged area on a photoreceptor. Since the language of the claims is ambiguous, we turn to an analysis of the specification, "which is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir.1996).

#### b. The Specification

HP next argues that the specification of the '272 patent "clearly uses the word spot

to refer to a light spot." They point to numerous instances where the specification "refer[s] to [the] motion of a spot, a property ... certainly not possessed by an exposed region on a photoreceptor."

PB replies that the word spot has two different meanings in the specification. They claim that "up to column 5, line 62, the terms 'spots' is used in the specification to refer to the laser light beam spot." However, PB argues that "there is a clear transition in the context and usage of spots" after that point. They argue that after column 5, line 62, the term spots is used to refer to discharged areas on the photoreceptor, and this definition should be applied when interpreting the claim language.

■ After reviewing the claim language, the court must review other parts of the patent document, including diagrams or figures, which are collectively referred to as the specification. *Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 116 S.Ct. 1384, 1387–88, 134 L.Ed.2d 577 (1996); *see also Al–Site Corp. v. Bonneau Co.,* 22 F.3d 1107 (Fed.Cir.1994). "The specification contains a written description of the invention that must enable one of ordinary skill in the art to make and use the invention. For claim construction purposes, the description may act as sort of a dictionary, which explains the invention and may define terms used in the claims." *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979 (Fed.Cir.1995) (internal citations omitted). Although "inventors may be their own lexicographers, they must use words in the same way in the claims and in the specification." *Fonar Corp. v. Johnson and Johnson,* 821 F.2d 627, 632 (Fed.Cir.1987). When a patentee uses "words which were defined in the specification," they "must be given the same meaning when used in the claims." *McGill Inc. v. John Zink Co.,* 736 F.2d 666, 673 (Fed.Cir.1984). A court reviews the patent specification to determine whether the patentee "used any terms in a manner inconsistent with their ordinary

meaning." *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir.1996).

■ In the instant case, the specification of the '272 patent indicates that the word "spot" means a spot of laser light. The word "spot" is used 44 times in the specification. PB concedes that 42 of the 44 times the word "spot" is used it refers to the light spot created by the laser beam. Their assertion that the remaining two uses of the word "spot" require a different definition is incorrect. Specifically, they refer the court to the following section:

> The use of different spot sizes can effectively be employed as letters or numbers are created so as to avoid roughened edges and improve character formation. The system of this invention can also employ two power sources using parallel laser beams with each of the beams being of a different diameter and corresponding spot size. This will provide a matrix of dots having different sizes for forming a single generated character. The different dot size will intermesh to create letters and numerals having smoother appearance.

When read in light of the entire specification, this section is consistent with the word spot meaning a spot of laser light. PB's invention does employ light spots to form generated characters. The characters are not formed directly by the light spots themselves, but by the discharged areas on the photoreceptor subsequently created by the light spots. The discussion in the cited section above is fully consistent with this interpretation. It discusses how the laser beams create spots which "in turn provide a matrix of dots." These "different size dots intermesh to create letters and numeral having a smoother appearance."

Read in its entirety, the specification of the '272 patent indicates that the word "spot" means a light spot. Since inventors "must use words in the same way in the claims and in the specification," it is logical to conclude that the word spot also means a light spot when used in the claims of

the '272 patent. *Fonar Corp. v. Johnson and Johnson*, 821 F.2d 627, 632 (Fed.Cir. 1987); *see also McGill Inc. v. John Zink Co.*, 736 F.2d 666, 673 (Fed.Cir.1984) (holding that words defined in the specification must be given the same meaning when used in the claims).[2] Allowing PB to employ two different definitions for the same word in a single specification would undermine the requirement that the claims clearly "demarcate the boundaries of the purported invention." *Athletic Alternatives Inc. v. Prince Mfg. Inc.*, 73 F.3d 1573, 1581 (Fed.Cir.1996).

#### c. The Prosecution History

HP further argues that the prosecution history of the '272 patent supports the assertion that the word spot means a light spot. Specifically, they point to the fact that the examiner amended the title to include the term "Light Spots." They contend that this fact provides further support for the conclusion that the word spot in the '272 patent means a light spot.

PB responds that a change of title does "not cast doubt on the meaning of the claim language." They argue that there "is no requirement that the title describe all embodiments an invention."

█ The undisputed public record of the proceedings in the PTO is of primary importance in understanding the claims. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980–81 (Fed.Cir.1995). The file history can function to limit claim construction so as to exclude any interpretation which was disclaimed during prosecution. *Southwall Technologies, Inc. v. Cardinal IG Co.*, 54 F.3d 1570 (Fed.Cir.

1995), *cert. denied*, 516 U.S. 987, 116 S.Ct. 515, 133 L.Ed.2d 424 (1995). The prosecution history must be read "in its full context, not on the basis of snippets lifted out of context." *J.T. Eaton & Co. v. Atlantic Paste and Glue Co.*, 106 F.3d 1563, 1576 (Fed.Cir.1997).

In the instant case, the prosecution history is consistent with the conclusion that the word "spots" means "light spots" in the '272 patent. According to Patent Office procedure, "[w]here the title is not descriptive of the invention claimed, the examiner should require the substitution of a new title that is clearly indicative of the invention." M.P.E.P. § 606.01 (1979). After evaluating the application, the examiner was in the best position to fully understand the nature of the invention and the meaning of the terms used in the patent. It is relevant that he chose to modify the noun "spots" with the adjective "light." This is reflective of his understanding that the word "spots" means "light spots" in the '272 patent.

#### 2. *Extrinsic Evidence*

█ The court concludes that the use of extrinsic evidence is unnecessary in this case. Extrinsic evidence may be evaluated "in order to aid the court in coming to a correct conclusion as to the true meaning of the language employed in the patent." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 981 (Fed.Cir.1995) (internal citations omitted). However, "reliance on such evidence is unnecessary, and indeed improper, when the disputed terms can be understood from a careful reading of the

---

**2.** PB also argues that interpreting the word spot to mean light spot would exclude the preferred embodiment from being covered by the claims of the '272 patent. Specifically, they contend that varying the intensity of the laser beam, which is the preferred embodiment as recited in claim 2, "does not change the size of the diameter of the projecting laser beam light spot." However, the court's determination that "spot" means "light spot" does not invalidate or exclude any claim of the '272 patent. One common convention in the digital printing field is to define the size of

a light spot as the area of light where the intensity exceeds a fixed threshold. Under this definition, the size of a projected light spot would change when the intensity of a light beam is varied. Thus, the preferred embodiment as recited in claim 2 is encompassed by the court's claim construction and no new limitations have been introduced. *See Eastman Kodak Co. v. The Goodyear Tire & Rubber Co.*, 114 F.3d 1547, 1556 (Fed.Cir. 1997) (courts should seek to interpret claims to preserve, rather than defeat, their validity).

**332**

public record." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584 (Fed.Cir. 1996).

In this case, the meaning of the phrase "spots of different sizes" can be understood from a careful reading of the claims, the specification, and the prosecution history. Accordingly, consideration of extrinsic evidence is unnecessary and improper.

## II

### Infringement Analysis

Once the meaning of the claims is determined, resolving an issue of patent infringement is a two step process. *See Unique Concepts, Inc. v. Brown*, 939 F.2d 1558, 1562 (Fed.Cir.1991). First, the court must determine whether the accused device literally infringes the claims. *See Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d 931, 933 (Fed.Cir.1987). If the court finds that the standard for literal infringement is not met, it must then decide whether the accused device infringes the patent under the doctrine of equivalents. *See Graver Tank and Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 94 L.Ed. 1097 (1950).

1. *Literal Infringement*

HP argues that the accused devices do not literally infringe the '272 patent since they do not use light spots of different sizes. They contend that the accused printers vary the time the light beam is on, which does not alter the size of the light spot on the photoreceptor.

PB responds that the accused printer "clearly infringes the '272 patent because it creates spots of different sizes by changing the size of the projected light spot through modulation of the laser beam."

■ An accused device literally infringes a patent claim only when the device contains each and every element of the claim. *See Stewart–Warner Corp. v. City of Pontiac*, 767 F.2d 1563, 1570 (Fed. Cir.1985). This requirement, often called the All Elements Rule, mandates that if the accused device does not possess all of the elements of the claim, there can be no

finding of literal infringement. *See London v. Carson Pirie Scott and Co.*, 946 F.2d 1534, 1539 (Fed.Cir.1991). "In the All Elements Rule, [the term] element is used in the sense of a limitation of a claim .... and an equivalent must be found for every limitation of the claim in an accused device." *Corning Glass Works v. Sumitomo Elec. USA, Inc.*, 868 F.2d 1251, 1259 (Fed.Cir.1989).

■ In the instant case, the accused devices do not literally infringe the '272 patent. It is undisputed that the accused printers do not create light spots of different sizes. PB's own expert Michael Bass conceded that HP's printers do not vary the size of the spot created by the light beam.

Q: Do the accused printers vary the size of the light beam spot?

Bass: I do not think—no they don't.

Thus, HP's printers lack an element required by the '272 patent. Since the accused devices do not contain "each and every element of the claim," they do not literally infringe the '272 patent. *Stewart–Warner Corp. v. City of Pontiac*, 767 F.2d 1563, 1570 (Fed.Cir.1985).

2. *Infringement Under the Doctrine of Equivalents*

HP next argues that its printers do not infringe the '272 patent under the doctrine of equivalents since "the 'spots of different sizes' limitation in each of the asserted claims expressly excludes all single-size spot systems and processes from the scope of the claims."

PB responds that "the difference between HP's accused printers and the claims [is] insubstantial" and the printers infringe the '272 patent under the doctrine of equivalents. They contend that "HP uses beam modulation to create spots of different sizes to smooth the edges of characters and numbers."

■ The doctrine of equivalents allows patentees to thwart infringers who make insubstantial changes in a patented

product. *See Winans v. Denmead,* [56 U.S.] 15 How. 330, 341, 14 L.Ed. 717 (1853). The purpose of the doctrine is "to temper unsparing logic and prevent an infringer from stealing the benefit of the invention." *Royal Typewriter Co. v. Remington Rand,* 168 F.2d 691, 692 (2d Cir. 1948). Under the doctrine of equivalents, an accused device infringes a claim if it performs substantially the same function in the same way to achieve the same result. *See Graver Tank and Mfg. Co. v. Linde Air Products Co.,* 339 U.S. 605, 608, 70 S.Ct. 854, 94 L.Ed. 1097 (1950); *See also Sanitary Refrigerator Co. v. Winters,* 280 U.S. 30, 42, 50 S.Ct. 9, 74 L.Ed. 147 (1929). Recently, the Supreme Court reaffirmed the validity of the doctrine in *Warner–Jenkinson Co., Inc. v. Hilton Davis Chemical Co.,* 520 U.S. 17, 117 S.Ct. 1040, 1054, 137 L.Ed.2d 146 (1997), stating "[w]e adhere to the doctrine of equivalents. The determination of equivalents should be applied as an objective inquiry on an element by element basis."[3] However, the claims can not be expanded by the doctrine of equivalents and "the concept of equivalency cannot embrace a structure that is specifically excluded from the scope of the claims." *Athletic Alternatives Inc. v. Prince Mfg. Inc.,* 73 F.3d 1573, 1582, (Fed. Cir.1996), *citing Dolly v. Spalding & Evenflo Inc.,* 16 F.3d 394, 400, (Fed.Cir.1994).

In this case, the accused printers do not infringe the '272 patent under the doctrine of equivalents. The fact that the claims require the use of "spots of different sizes" excludes devices which produce single sized light spots. Since "the concept of equivalency cannot embrace a

structure that is specifically excluded from the scope of the claims," the accused devices do not infringe the '272 patent under the doctrine of equivalents. *Athletic Alternatives Inc. v. Prince Mfg. Inc.,* 73 F.3d 1573, 1582, (Fed.Cir.1996), *citing Dolly v. Spalding & Evenflo Inc.,* 16 F.3d 394, 400, (Fed.Cir.1994).

Further, finding that the doctrine of equivalents is applicable in this case would improperly eliminate an individual claim element. In *Warner–Jenkinson Co., Inc. v. Hilton Davis Chemical Co.,* 520 U.S. 17, 117 S.Ct. 1040, 1049, 137 L.Ed.2d 146 (1997), the Supreme Court explained that the proper application of the doctrine of equivalents requires a "focus on individual elements and a special vigilance against allowing the concept of equivalence to eliminate completely any such elements." Allowing the '272 patent to encompass printers which produce only one size of light spot when the claims are expressly limited to spots of different sizes would improperly "eliminate that element in its entirety." *Warner–Jenkinson Co., Inc. v. Hilton Davis Chemical Co.,* 520 U.S. 17, 117 S.Ct. 1040, 1049, 137 L.Ed.2d 146 (1997).

### CONCLUSION

For the forgoing reasons, the court concludes that the phrase "spots of different sizes" as used in the '272 patent means light spots of various sizes. Since it is undisputed that the accused devices do not employ light spots of different sizes, the defendant's motion for summary judgment (document no. 178) is GRANTED.

SO ORDERED.

---

3. At the same time the Court affirmed the use of the doctrine of equivalents, they cautioned that "the doctrine of equivalents, as it has come to be applied since Graver Tank, has taken on a life of its own, unbounded by patent claims.... [I]t is important to ensure that the application of the doctrine, even as to an individual element, is not allowed such broad play as to effectively eliminate that element in its entirety. So long as the doctrine of equivalents does not encroach beyond the limits just described ... we are confident that that the doctrine will not vitiate the central functions of patent claims themselves." *Warner–Jenkinson Co., Inc.,* 117 S.Ct. at 1049.

334

EXHIBIT 1

U.S. Patent May 31, 1983 Sheet 1 of 2 4,386,272

Fig. 1